**John Nolan, Plaintiff-Appellant, v. Shaf Manufacturing Company, a Corporation, et al., Defendants-Appellees.**

Gen. No. 69–119.

Third District.

August 4, 1970.

Bozeman, Neighbour, Patton & Noe, of Moline, for appellant.

Graham, Califf, Harper, Benson & Fox, of Moline, for appellees.

ALLOY, J.

This cause originated as an action filed by plaintiff John Nolan as against Shaf Manufacturing Company, and Vernon W. Furrow and C. D. Williamson, d/b/a Cashway Lumber Company, seeking damage for personal injuries sustained when a ladder collapsed February 17, 1965. A jury verdict was returned in favor of plaintiff as against defendant Shaf Manufacturing Company in the amount of $7,000. The verdict was in favor of defendant Cashway Lumber Company and such defendant is not involved in the present appeal. Following such verdict, the trial court granted defendant Shaf Manufacturing Company's motion for a directed verdict which had been filed at the close of all the evidence and upon which a ruling had been reserved. The court thereupon set aside the judgment which had been entered for plaintiff on the jury's verdict and entered judgment for defendant Shaf Manufacturing Company. Plaintiff appeals from such order.

Plaintiff John Nolan, 36 years of age, was in the siding and roofing business. On February 18, 1965, he purchased a 24-foot aluminum extension ladder from Cashway Lumber Company in Davenport, Iowa. The ladder was manufactured by Shaf Manufacturing Company, a Pennsylvania corporation. Before making the purchase, plaintiff told the salesman the use to which he would put the ladder, and the salesman assured him that the ladder would hold up to 1,000 pounds. Plaintiff used the ladder about 9 times prior to April 17, 1965. The ladder was stored overnight in plaintiff's locked garage, except that while it was being used on the job, it was usually stored in the customer's garage. On the particular job where plaintiff was injured, there was no garage, so the ladder was kept outside and covered up at night with aluminum foil. The ladder was inspected each day before use by plaintiff and prior to April 17, 1965, a slight bow developed on the bottom rung. Plaintiff stated that this bow was caused by applying pressure when setting the ladder on the ground and preparing to use it. This bow was not shown to be a factor in the failure of the ladder.

On the second day of the particular job (April 17, 1965), plaintiff reset the ladders following lunch. A wooden ladder and the aluminum ladder purchased from Cashway were set up against the house and ladder jacks were used to allow a plank to be set between the ladders. The aluminum ladder was extended to 20 feet and the plank was set so that it was level and extended the same distance out beyond each of the ladders. The base of the aluminum ladder was 5 feet out from the house. Plaintiff was sitting in the center of the plank and Mr. Poole, his helper, was starting up the aluminum ladder with material. The combined weight of the plaintiff, Mr. Poole, the plank, the material being carried, and the ladder jacks, was about 400 pounds, with approximately 285 pounds being on the aluminum ladder. As Mr. Poole started up the ladder, plaintiff heard a

crack and the next thing he knew, he was on the ground, after falling about 18 feet. The lower section of the aluminum ladder had buckled, causing the ladder to be bent into a shape like an "L." The two sections of the ladder did not come apart. Plaintiff sustained a broken right ankle and tailbone, lost work, and had medical expenses.

Following the accident, Mr. Buck, a representative of American States Insurance Company took the ladder to his warehouse. American States was the workmen's compensation carrier for Quint-City Improvement Company, which was the firm through which plaintiff obtained the job on which he was working. American States was in no way involved in the instant case. While it was in the warehouse, the ladder was photographed by representatives of both plaintiff and the defendant, Shaf Manufacturing Company. Plaintiff's attorney attempted to locate the ladder thereafter, before the trial, for use at the trial but the ladder could never be located.

Mr. Ekblad, the owner of the house on which plaintiff was working at the time of the accident, testified that the ladder was bent in the shape of an "L" after the accident. He stated there was also an extra twist on one of the rails and that no one tampered with the ladders while they were stored at his house. One of the partners in Cashway Lumber Company testified that Cashway had nothing to do with the ladders after they are received from Shaf Manufacturing Company and that the ladders were stored and then sold.

Mr. Merion, the President of Shaf Manufacturing Company, testified as an expert witness. He stated that the company's ladders could hold 1,200 pounds and are tested for 800 pounds. He stated that all rail material is tested for hardness and density, and, eventually, 12 to 15 percent of the material goes into the manufacture of a test group of ladders. There are random checks made of the other 85 to 88 percent of the ladders. Mr. Merion was also asked, "If one of your ladders is extended to 20

feet in length with the base being 5 feet out from the wall against the floor itself, leaning, and the ladder buckles under a weight of 285 pounds, would it be a fair statement that there is something wrong with the ladder?" Mr. Merion answered, "It would seem that there is something wrong with it, yes." As we have indicated previously, the jury returned a verdict of $7,000 against Shaf Manufacturing Company, and, also, a verdict in favor of defendant Cashway Lumber Company. Defendant Shaf Manufacturing Company submitted two special interrogatories to the jury. The first interrogatory asked if plaintiff failed to exercise ordinary care. The jury answered this question in the negative. The second question asked if the ladder was in an unreasonably dangerous condition when it left Shaf. The jury answered that it was. In defendant's post-trial motion, no mention was made of the two special interrogatories. The trial judge allowed the post-trial motion and ordered that the motion for directed verdict made by defendant Shaf at the close of all the evidence be allowed. The jury verdict in favor of plaintiff was set aside.

The first question for consideration is whether it was proper for the trial judge to set aside the answers to the special interrogatories when there was no specific objection made to such interrogatories in defendant's post-trial motion. As indicated, the jury answered that plaintiff was not guilty of contributory negligence, and, also, that the ladder was in an unreasonably dangerous condition at the time it left the control of defendant, Shaf Manufacturing Company. The order of the court, in effect, set aside the special findings of the jury. Plaintiff contends that this was improper on the authority of Quagliano v. Johnson, 100 Ill App2d 444, 241 NE2d 187 and Westlund v. Kewanee Public Service Co., 11 Ill App 2d 10, 136 NE2d 263. Each of these cases differs from the case before us in that the appellant in such cases had failed to specifically question the special finding at

24

the trial court level and raised the question for the first time on appeal. In the Quagliano case, plaintiff had submitted special interrogatories which the jury answered in such manner as to show plaintiff had failed to sustain his burden of proof. There was also a general verdict by the jury in favor of defendant. Plaintiff made no objection to such special findings and did not mention them in his motion for a new trial. When plaintiff reached the appellate court level, he was met with the objection that he had failed to attack the special findings at the trial court level. The Appellate Court held that such failure was fatal to his contention that the verdict was against the manifest weight of the evidence. The court pointed out that unless a party moves to set aside the answer to the special interrogatory or attacks it in a motion for a new trial, the special findings are considered to have been fully supported by the evidence. The Westlund case is similar except that it was defendant in the Westlund case who failed to make the objection to the jury's special finding. In that case the court also emphasized that no objection was made to the special findings in the motion for new trial. In the cause before us, the special findings and the jury's verdict were consistent since both found for the plaintiff. The trial court then set aside the verdict for the plaintiff by allowing plaintiff's motion for a directed verdict.

 If the post-trial motion had been denied and defendant had appealed then, the cause before us would have been similar to the Quagliano and Westlund cases, and defendant could not have questioned the special findings on appeal. The trial judge, therefore, had the power to set aside the special findings even though such findings were not objected to specifically by defendant in the post-trial motion. This authority of the trial judge to set aside special findings on his own motion has been recognized in such cases as Freeman v. Chicago Transit

Authority, 33 Ill2d 103, 210 NE2d 191, and Freeman v. Chicago Transit Authority, 50 Ill App2d 125, 200 NE2d 128. As stated by the court in Freeman v. Chicago Transit Authority, 33 Ill2d 103, 105–6, 210 NE2d 191:

> "The function of a trial judge in determining whether the answer to a special interrogatory is against the manifest weight of the evidence is analogous to his function in determining whether a general verdict is against the weight of the evidence, and his authority to act upon his own motion should be the same in both instances."

It is also contended, since the order of the trial judge granting defendant's post-trial motion did not specifically set aside special findings, that the special findings still stand. Since those special findings were consistent with the general verdict for plaintiff, when the trial judge set aside the general verdict, he automatically set aside the special findings and it was not necessary to specifically mention such findings in the order.

The significant question before us is whether the record in the cause now under consideration discloses that plaintiff made sufficient proof for recovery under the precedent of Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182. The first subsidiary question involved was whether it was necessary for plaintiff to produce the ladder in court or to at least have it available so that it could be examined by experts. Defendant contends that under the authority of Shramek v. General Motors Corp., 69 Ill App2d 72, 216 NE2d 244, it was necessary for plaintiff to produce the ladder in court or at least allow experts to examine it, before plaintiff could establish a case under the Suvada theory. The Shramek case involved a tire which was purchased on a new automobile on February 3, 1961, which blew up after it had been driven for 10,000 miles 8 months after it was pur-

chased. The court in that case (at pages 77–78) recognized that under the Suvada strict tort liability theory, it is possible in some situations for plaintiff to prove his case by circumstantial evidence, but that in the facts in the Shramek case, circumstantial evidence could not be used. The court stated:

> "It would be incumbent upon plaintiff to prove the essential elements of his case by either direct or circumstantial evidence. The record shows that this would be an impossibility. Whether the charge is breach of implied warranty, negligence or the strict tort liability now recognized in both Illinois (Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182 [1965]) and California (Greenman v. Yuba Power Products, Inc., 59 Cal2d 57, 377 P2d 897 [1963]), the cornerstone of plaintiff's cause of action is the existence of a defect in the tire at the time it left the control of the manufacturer or seller. Without this proof his case must fall."

The court recognized that because of the type of article involved (an automobile tire) and the use which it had been subjected to since leaving the manufacturer (over 10,000 miles in 8 months' use), circumstantial evidence could not be used as the sole basis for showing the defect. The court stated in that case (at page 78):

> "The mere fact of a tire blowout does not demonstrate the manufacturer's negligence, nor tend to establish that the tire was defective. Blowouts can be attributed to myriad causes, including not only the care with which the tires are maintained, but the conditions of the roads over which they are driven and the happenstance striking of damaging objects."

The court did not permit the case to go to the jury since the jury would have no basis to determine whether the

tire was defective when it left defendant's control and whether such defect ultimately caused plaintiff's injuries.

Following the Shramek case, another important case which is relevant to the issues before us has been determined by the Appellate Court in this State. In Texaco, Inc. v. McGrew Lumber Co., 117 Ill App2d 351, 254 NE2d 584, plaintiff was injured when a wooden scaffolding plank on which he was standing broke in half. Plaintiff settled with certain defendants who then sought to be indemnified under the strict tort liability theory of the Suvada case. The broken plank was not produced at the trial, although there were photographs of the broken plank which were introduced in evidence. There was also testimony as to these photographs which was summarized by the court (254 NE2d at 589) :

> "First of all, several of plaintiffs' witnesses testified from experience in the field of scaffolding construction with regard to acceptable standards for lumber used in that field. Special attention was given to the presence of knots in a plank which could cause a defect in such lumber. Then the plaintiff produced several witnesses who testified of the breaking of the plank and identified photographs upon which they noted a portion of the plank where knots in the lumber were identified. On the strength of this evidence, we feel that substantial evidence was introduced which would allow the jury to conclude upon the proof of causation."

It was argued in the Texaco case that under the Shramek decision it was necessary that the board be brought into court. The court in the Texaco case said (254 NE2d at 589) :

"We are of the opinion that the SHRAMEK case is not applicable. We believe that the evidence elicited by the photographs of this plank showed that the knots identified by several witnesses were sufficient to indicate a cause for the break in this plank. It was not incumbent upon the plaintiffs to disprove other possible causes. Furthermore, there was sufficient evidence based on the expertise of several witnesses to substantiate the cause of the break which occurred with this particular plank. We are further convinced of this conclusion by the record which is devoid of any objection made to the introduction of these photographs and their use at the trial."

■■■■■■ We feel that the facts in the cause before us put it more in line with the Texaco decision than with the Shramek case. It is noted, also, that the Shramek case recognized that a defect could, in a proper case, be proven by circumstantial evidence under the Suvada theory. It is necessary to show by circumstantial or other evidence, that the product was in fact defective; that the defect existed at the time it left the hands of the Shaf Manufacturing Company; that the defect made the product unreasonably dangerous; and that the defect was the proximate cause of the injury. The only substantial question is the existence of the defect and whether it existed when it left the hands of defendant Shaf Manufacturing Company.

The evidence which was introduced in the instant case consisted of photographs of the ladder showing it bent at a 90° angle. The evidence disclosed the short period of time which plaintiff had owned the ladder before discovering the defect and the fact that he had used it only about 9 times before the accident. The evidence also disclosed that only about 285 pounds were placed on the

ladder when it collapsed, even though it was designed to hold a minimum of 800 pounds. The evidence also established that no outside agency created the defect. All of this evidence was bolstered by the testimony of the president of Shaf Manufacturing Company, who testified that if the ladder buckled under the weight of 285 pounds when extended to 20 feet with the base 5 feet from the wall (the condition in the instant case), there would be something wrong with the ladder. The only evidence of any malfunction of the ladder prior to the collapse was the bow in the bottom rung. It was shown in the record that this could have been caused by plaintiff pushing the ladder into the ground to set it. The bend in the ladder causing the collapse was not in the area of the bowed rung. On the basis of the record before us, we feel that plaintiff made out a sufficient case to go to the jury and the finding by the jury in favor of plaintiff is not contrary to the manifest weight of the evidence. In directing a verdict, the evidence in favor of plaintiff standing alone should be considered. In applying such tests in the instant case it was clearly erroneous for the trial judge to allow the post-trial motion and direct a verdict for defendant (Pedrick v. Peoria & E. R. Co., 37 Ill2d 494, 229 NE2d 504).

It is our conclusion, therefore, that it is not indispensable in a cause, where facts exist as shown by the record in the case before us, that the ladder itself be produced at the trial. The testimony of the president of Shaf Manufacturing Company clearly disclosed that the collapse of the ladder could only result by reason of a defect in its manufacture or a defect in the material of which it was manufactured. The photograph in evidence clearly disclosed the nature of the failure of the ladder. A ladder, such as that involved in the case before us, would not collapse unless there was a defect in it. In the

cause before us, plaintiff could not present the ladder itself through no fault of his own since the article was lost and not within his control. There was also a very short time lapse between the purchase of the article and the discovery of the defect as a result of the accident. The ladder had been in use about nine times and was protected from any other damaging agency in such manner that the defect could reasonably have been determined by the jury to be a preexisting defect at the time of manufacture. The record discloses that there was no opportunity for tampering with the ladder. There is, consequently, a sufficient showing from the testimony of the president of defendant company and other evidence to sustain a recovery for plaintiff. Plaintiff was not relying simply on the collapse of the ladder as proof of the defect.

■■ Since it was error for the trial court to set aside the verdict and the judgment in the cause before us, this cause is reversed and remanded to the Circuit Court of Rock Island County with directions to reinstate the verdict and judgment in the amount of $7,000 in favor of plaintiff John Nolan as against Shaf Manufacturing Company, a corporation.

Reversed and remanded with directions.

RYAN, P. J. and STOUDER, J., concur.