JOSEPH COLLINS, Plaintiff-Appellee, v. MONTGOMERY WARD & Co. *et al.*, Defendants-Appellants.

(No. 11845; ▬▬▬▬

Fourth District—August 8, 1974.

*Rehearing denied September 12, 1974.*

TRAPP, J., dissenting.

Harold F. Tenney, of Armstrong, Winters, Prince, Tenney & Featherstun, of Decatur, for appellants.

Rosenberg, Rosenberg, Bickes & Johnson, of Decatur (David L. Johnson, of counsel), for appellee.

Mr. PRESIDING JUSTICE SMITH delivered the opinion of the court:

This is an appeal by both defendants from a judgment of the circuit court of Macon County entered on a jury's verdict awarding the plaintiff $10,000 for injuries sustained in a fall from a ladder. The bare-bones questions left in the case are: (1) Does the indemnification agreement between plaintiff and defendant Ward exculpate Ward from any liability to the plaintiff? That question we answer "No." (2) Was there sufficient

evidence in this case to take the case to the jury on the question of defective design? This question we answer "Yes."

On April 16, 1969, the plaintiff entered into a contract with Ward in Decatur as an independent installer of aluminum siding. On April 21, he purchased from Ward a 24-foot aluminum extension ladder which had been manufactured by the defendant Werner. The ladder came in two sections. Three days after the purchase, the plaintiff used the separated sections of the ladder to erect a ladder jack scaffold for applying aluminum siding to a house. Plaintiff had done this type of work for over 20 years and was accustomed to using ladders, jacks and scaffolds and was acquainted with the usual and customary safety methods in the use of ladders. He had read the "Ladder Safety Instructions" on the ladder. Working alone, he placed the base section of the ladder, that is, the one with the feet, on a wooden patio elevated about 6 inches above the ground level towards the east end of the south side of the house. The other section (referred to as the "fly" section) was placed about 14 feet to the left of the base section. The bottom of this section was in a strawberry patch and was pushed several inches into the ground with the result that the top of the base section was about 1 foot higher than the top of the fly section. Each section was leaning forward against the house at an angle. The bottom of each section was about 4 to 5 feet from the house.

On each section, the plaintiff attached a ladder jack and these jacks supported a scaffold board that was 15 feet long. These jacks were placed on the ladder rungs so that the scaffold board would be level. Apparently the scaffold jacks were attached to the second and fourth rungs of the base section and projected in a southerly direction from the ladder section so that the scaffold board was further away from the house than the ladders. Plaintiff weighed about 155 pounds and was 48 years of age. He testified that about 30 minutes after erecting this scaffold, he was standing with both feet on the board and none of his weight on the ladder. While he was putting a piece of siding in place, he felt the scaffold start to move and believed it moved to the right, but didn't know which way it moved. Just before he fell, he was pushing slightly upward to get a piece of siding into place. There was nothing unusual about the way that it was going into place and he had done the same thing before with other pieces while he was on the scaffold. He recalled no noise at the time before he hit the ground. He did not know whether he fell on the ladder or not. The right leg of the base ladder section was bent directly to its left. Plaintiff does not remember whether he fell on the ladder or whether the ladder bent and then he fell.

■■ The plaintiff was working for defendant Ward as an independent

contractor, and had executed a contract which stated: "Contractor shall indemnify and save Ward harmless against all actions, claims, demands, costs, damages or expenses of any kind which may be brought or made against Ward for which Ward might pay or incur by reason of any injury to persons or damage to property resulting from contractors operating under this agreement." This contract was pleaded by Ward as one of its affirmative defenses and was stricken upon motion by the plaintiff. We think it was properly stricken. It is to be noted that the language of the indemnity or exculpatory clause is broad enough to include the plaintiff within its terms. It is not as specific on this point as was the agreement in *Schek v. Chicago Transit Authority*, 42 Ill.2d 362, 247 N.E.2d 886. Neither do we think it can be extended to indemnify or protect Ward from liability on a ladder sold by it because of strict liability imposed for defective design. It is abundantly clear from the agreement itself that this was designed to protect Ward while the plaintiff was in the performance of contractual obligations and using materials furnished by Ward. In short, it protected Ward from the negligent injury by the plaintiff of third persons or property. It would seem to be an undue extension of this agreement to protect Ward in a products liability case separate and distinct from its indemnification contract with the plaintiff. This court and the supreme court held in *Tatar v. Maxon Construction Co.*, 54 Ill.2d 64, 294 N.E.2d 272, that an agreement such as this could not protect against the plaintiff's own negligence. So in like manner the agreement does not protect against an injury resulting from a liability strictly imposed because of a transaction between the parties not specifically related to the indemnification agreement. The employment contract and the merchandise purchase are separate and distinct transactions.

The complaint in this case alleged "that said ladder, although not inherently or unreasonably dangerous, would become so if designed improperly, manufactured defectively or made of defective materials, which facts were known or should have been known to the defendant." Part way through the defendants' testimony, the plaintiff eliminated defective manufacture or defective material and hence the verdict in this case, if it is to be sustained at all, must rest on the allegation of improper design. As stated by the court and subscribed to by both counsel, the issue was strictly confined. The court stated: "It's design we're talking about * * *. Is this a dangerous product as designed? Not as manufactured. We're no longer talking about was the material defective as far as flaws. We're no longer talking about were the manufacturing processes poor. We're only talking about, was it suitable for the use intended, by design." As the trial court rather succinctly stated: "We're

attacking the ladders generally, not this particular ladder. Right?" Mr. Johnson: "That's right." The court: "That's the theory of the plaintiff's case. These ladders are dangerous ladders, is that what you're saying? They're not designed right, they're not suitable for the purpose intended."

Thus, the trial court and the parties erected a Chinese wall which confines them as well as us to the narrow issue here presented. We note that the allegations in the complaint make no attempt to describe, define or point out the design defect upon which recovery is sought. We note also that the defendants' interrogatory directed to the plaintiff requesting that he point out the specific design defect went unanswered. Unless, therefore, we can find in the evidence some answer to what that defect may have been, the trial jury operated in a vacuum and we search in vain for the nonexistent. It is surely fundamental in our system that a party cannot have relief under proof without allegations nor allegations without any proof to support a verdict or a judgment. It is fundamental in a case of this character that the plaintiff must prove his injury or damage resulted from the condition of the product, that is, a defective design and that that condition was an unreasonably dangerous one and existed at the time the ladder left the control of the manufacturer and of Ward. *Fanning v. LeMay*, 38 Ill.2d 209, 230 N.E.2d 182.

■■ We turn now to whether or not there was sufficient evidence to go to the jury on defective design. Two experts testified. The defendants' expert ran an independent testing laboratory for ladders. He tested the same model ladder and found that it met the UL code. He testified that a man standing on the scaffold above the ladder could not create a sufficient force to bend the lower side rail. In his opinion, the deformation in the leg of the ladder was caused by a falling object. The plaintiff's expert was a professor of theoretical and applied mechanics at the University of Illinois and testified as to certain observations he made concerning the design of the ladder in question and answered a series of questions propounded by plaintiff's counsel concerning the design of the ladder. He examined the accident ladder and photographs but made no mechanical tests. A hypothetical question was propounded to him and the defendant moved to strike his answer. The court stated, "Show motion granted." Additional direct and cross-examination was conducted and the plaintiff moved to reinstate his hypothetical question and answer. The court replied, "And I thought the motion was good and I'm going to let the ruling stand." He likewise however refused to instruct the jury to disregard the hypothetical question and answer. In this situation, therefore, no attempt was made to remove these facts or the expert's conclusionary answer from the consideration of the jury. That witness likewise stated that the design was deficient in that the web and the

flanges were extremely thin and that these items are a type of alloy that can buckle if severely overloaded. He testified likewise about the design of the ladder's foot as having an effect on its strength and safety, that the 12 inches between the bottom rung and the end of the ladder were so long that if it were loaded axially with compressive loads, it would buckle under one-fourth of the normal load. He further testified that the ladder might be dangerous under normal, ordinary and intended use. There was a statement by the plaintiff that he felt a movement before he fell. If believed by the jury, this would indicate either the ladder slipped or the leg gave way or there was a combination of both. In any event there was sufficient evidence touching design to go to the jury. Under the evidence, it is a jury question rather than a legal question. (*Nolan v. Shaf Manufacturing Co.*, 128 Ill.App.2d 19, 261 N.E.2d 209.) In that case, an aluminum ladder was involved which had been tested for 800 pounds. There the president of the defendant company testified that if his ladder was 20 feet in length and the base 5 feet out from the wall against the floor itself leaning and the ladder coupled under a weight of 280 pounds, would it be a fair statement that there is something wrong with the ladder. The president of the defendant manufacturing company answered the question, "Yes.". In the instant case, the ladder was constructed likewise for 800 pounds stress and the weight of the plaintiff on the ladder plus the 40 pound weight of the board and the ladder warrant the conclusion that the trial court should not have granted either a motion for directed verdict nor a motion for a judgment *n.o.v.* In *Nolan*, the trial court did grant a judgment and set aside a jury's verdict. The appellate court reversed and remanded with directions to reinstate the verdict. We conclude therefore that there was credible evidence for the jury to consider within the guidelines of *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.*, 49 Ill.2d 118, 273 N.E. 2d 809, and that such evidence went to the issue of defective design.

Other issues raised in this case in view of the limited issue and the limited pleading require no consideration as they relate basically speaking to issues not now on appeal.

Accordingly, the judgment must be affirmed.

Affirmed.

CRAVEN, J., concurs.

Mr. JUSTICE TRAPP dissenting:

The principal opinion points out that the trial court determined that the opinion testimony at issue was inadmissible but failed or refused to instruct the jury to disregard it.

Where opinion testimony is improperly admitted in the trial court, the reviewing courts have found it necessary to reverse and remand for a new trial. *Marshall v. First American National Bank*, 91 Ill.App.2d 47, 233 N.E.2d 430; *Pritchett v. Steinker Trucking Company, Inc.*, 108 Ill. App.2d 371, 247 N.E.2d 923; *Butler v. Palm*, 36 Ill.App.2d 351, 184 N.E. 2d 633.

Such testimony is particularly prejudicial since there is no other evidence to sustain the jury issue of "defective design." This case demonstrates all too well the hazards of lax standards of the hired expert.

The cited *Nolan v. Shaf Manufacturing Co.*, 128 Ill.App.2d 19, 261 N.E.2d 209, does not concern the issue of the prejudicial effect of inadmissible expert opinion, but rather the sufficiency of circumstantial evidence to support the verdict. While there are references to the admissions of defendant's expert witness, there is no issue of the admissibility of his testimony.

The record further shows that certain conclusions of the purported expert were permitted to go to the jury. While he concluded that the metal was "too thin" he made no tests, no measurements, no calculations and disregarded all published standards and testing data.

Since the prejudice is patent, I would reverse and remand for a new trial.