**Chitta R. NANDA, Plaintiff-Appellee, Cross-Appellant,**

v.

**FORD MOTOR COMPANY, Defendant-Appellant, Cross-Appellee.**

No. 73–1726.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1974.

Decided Dec. 27, 1974.

Rehearing Denied March 25, 1975.

Francis D. Morrissey, Chicago, Ill., for appellant.

Richard J. Phelan, Chicago, Ill., Donald M. Reno, Sr., Champaign, Ill., for appellee.

Before FAIRCHILD, PELL and TONE, Circuit Judges.

TONE, Circuit Judge.

The principal issue before us in this diversity case is whether under Illinois law an automobile manufacturer has a duty so to design and to manufacture its product that its occupants will not be subjected to an unreasonable risk of injury if a collision occurs which is not itself caused by any defects in the condition of the automobile. We hold that such a duty exists in the circumstances of this case and affirm the District Court's judgment on a jury verdict in favor of the plaintiff.

The evidence, "when viewed in the aspect most favorable to" the plaintiff (Pedrick v. Peoria E. R.R., 37 Ill.2d 494, 510, 229 N.E.2d 504, 513–514 (1967)), supports the following version of the facts:

At about 8:30 P.M. on October 29, 1967 plaintiff Chitta R. Nanda, driving alone in his 1967 Ford Cortina, stopped in the inner northbound lane of Route 45 in Urbana, Illinois, to wait for an opening in southbound traffic so he could turn left into an access road. While stopped, the Cortina was struck in the rear by a 1962 Oldsmobile traveling at a speed the jury could have found was as low as 10 miles per hour. This collision injured no one and caused only relatively minor damage to the front of the Oldsmobile. The Cortina, however, was spun around and pushed into the southbound lanes, where it was struck in the rear by a southbound Rambler. The Rambler was traveling at about 40 miles per hour when the driver saw the Cortina and applied the brakes, which grabbed before the collision with the Cortina.

The jury could have found that the collision with the Oldsmobile caused a small fire on the rear of the Cortina, which was the size and shape of a grapefruit with a stream coming up from it and which, when the Rambler struck the Cortina, grew into a huge ball, enveloping the Cortina and the front of the Rambler. Almost instantaneously after the second collision the inside of the Cortina was engulfed in flames. Plaintiff suffered permanently disfiguring and disabling burns.

Plaintiff contends that design defects in the Cortina caused his injury. The fuel tank in the 1967 Cortina, like that in at least some other models manufactured by defendant, was "dropped into" a hole in the floor of the trunk, the top of the fuel tank serving as a portion of the floor of the trunk. The only shield separating the fuel tank from the passenger compartment was a piece of cardboard. Other automobile manufacturers in the United States provided a trunk floor consisting of some kind of continuous metal panel which shielded the fuel tank from the passenger compartment, and after 1971 defendant itself abandoned the "drop-in" fuel tank installation. In addition, the fuel-filler pipe in the 1967 Cortina ran through the trunk compartment and was connected to the outer shell of the car by a rubber grommet and, the jury could have found, was so designed that it lacked flexibility, flexion at one end tending to pull the pipe loose. In at least some of the other types of cars defendant manufactured, it attached the flange of the fuel-filler pipe to the outer shell of the car by metal screws or bolts.

## I.

### The Duty of the Manufacturer Under Illinois Law

 Courts have differed on the issue of the liability of an automobile manufacturer for injuries to occupants of the automobile resulting from a collision not itself caused by any defects in the condition of the automobile, sometimes called the "second collision" issue.[1] The two leading cases are one in this court applying Indiana law, Evans v. General Motors Corp., 359 F.2d 822 (7th Cir. 1966), cert. denied, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966), and one in the Eighth Circuit applying Minnesota law, Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968). Evans, in which the court reasons that the intended use of an automobile does not include participation in collisions despite their foreseeability, holds that the manufacturer is not liable. Larsen, on the other hand, holds that since injury-producing impacts are foreseeable, the manufacturer has a duty so to design its vehicle that the user will not be subjected to an unreasonable risk of injury in the event of collision. We are, of course, not bound by Evans, because in this case the law of Illinois rather than Indiana is controlling.

The Illinois Supreme Court recently considered the Evans and Larsen cases and the divergent lines of cases following them in Mieher v. Brown, 54 Ill.2d 539, 301 N.E.2d 307 (1973). In the Mieher case the court held that the manufacturer of a truck was not liable for the death of the driver of an automobile that had run under the rear of the trunk bed, the truck having no rear bumper or shield to prevent such an occurrence. The controlling issue, in the words of the court, was "whether the defendant and the decedent stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the decedent". (54 Ill.2d at 541, 301 N.E.2d at 308.) After analyzing the Evans and Larsen lines of cases, the court did not expressly adopt either view. Rather it distinguished those cases:

"The question in Larsen and Evans concerned the duty of the manufacturer to design a vehicle in which it was safe to ride. The question in our case involves the duty of the manufacturer to design a vehicle with which it is safe to collide." (54 Ill.2d at 543, 301 N.E.2d at 309.)

In deciding that question, the court said, the controlling considerations are whether "it appears to the court highly extraordinary that it [the defendant's conduct] should have brought about the harm,"[2] and whether the defendant has created "an unreasonable risk of injury" or "an unreasonable danger."[3] The court applied these tests to the accident before it and concluded that the alleged defective design did not create "an unreasonable danger or an unreasonable risk of injury," and that the manufacturer did not have a duty "to design his vehicle so as to prevent injuries from the extraordinary occurrences of this case." (54 Ill.2d at 545, 301 N.E.2d at 310.) Justice Goldenhersh, in dissent, disagreed with the court's result but said of the majority opinion:

"Upon a close reading of the opinion it appears to me that the majority recognize that the duty owed by the manufacturer is to design his vehicle so as to avoid the unreasonable risk of injury in the event of collision irrespective

---

1. In the jargon of automobile tort law, the "first collision" is the accident in which the vehicle strikes another vehicle or object, and the "second collision" occurs when the occupants of the vehicle are exposed to an unreasonably dangerous condition because of the design of the vehicle. The "first collision" is not caused by the allegedly defective design, but the "second collision" is. A second collision with still another vehicle, which occurred in the case at bar, is not necessarily a part of a "second collision" case and is not the "second collision" to which that term refers.

2. Restatement of Torts (Second) § 435(2) (1965) is quoted and relied upon by the court, as is Prosser, Palsgraf Revisited, 52 Mich.L. Rev. 1, 27 (1953).

3. The phrase "an unreasonable risk of injury" appears in Larsen v. General Motors, supra, 391 F.2d at 502.

of whether the injured is within or without the particular vehicle, and insofar as the opinion so holds, I concur."

The Illinois Supreme Court followed and applied Mieher v. Brown in Cunis v. Brennan, 56 Ill.2d 372, 308 N.E.2d 617 (1974), in which the plaintiff, when the automobile in which he was riding and another automobile collided, had been thrown approximately 30 feet to a parkway, where one of his legs was impaled on an object protruding from the ground. In holding that the municipality was not liable for permitting a dangerous condition to remain on the parkway, the court applied the "unreasonable danger" test of Mieher and concluded that the municipality's duty did not extend to maintaining the parkway to guard against "the remote possibility" of the "tragically bizarre" and perhaps "unique" occurrence for which the plaintiff sued. Again Justice Goldenhersh dissented.

■ Application of the principles stated in the Mieher and Cunis opinions requires affirmance here. Viewing the evidence in the light most favorable to the plaintiff, it does not appear to us to be "highly extraordinary" that the absence of a firewall or shield between the fuel tank and the passenger compartment and the condition of the filler-pipe assembly would bring about the harm for which plaintiff sues. The jury could have found that those conditions, in the words of the Mieher opinion, constituted an "unreasonable danger" and subjected the user of the product to "an unreasonable risk of injury." A rear-end collision is the most common of highway mishaps, and it is not "extraordinary," "bizarre," "unique," or "freakish and . . . fantastic"[4] for such a collision to impel the victim vehicle into a collision with a third vehicle. We believe the law of Illinois to be that when an automobile is so

constructed that its occupants are subjected to an unreasonable risk of being severely injured if it becomes involved in an accident that is not of a highly extraordinary kind, the manufacturer is liable for resulting injuries to occupants of the automobile.

In what amounts to an argument that the circumstances of plaintiff's injury were extraordinary and therefore comparable to those in Mieher and Cunis, defendant assumes impact speeds of 20 or 25 miles per hour for the first impact and 40 or 45 for the second, applies the formula for determining kinetic energy to calculate the forces of the two impacts, and arrives at a total force which it says was approximately equivalent to the force that would have been received if the Cortina had been backed off the roof of the Marshall Field Building. The jury could have found, however, from testimony that the impact speeds were lower than defendant assumes[5] and the evidence that the only major injuries suffered by anyone involved in the collisions were plaintiff's burns, that lesser forces were involved. Indeed, it would be difficult for us to believe, if we were the trier of the facts, that a passenger in a car backed off the roof of the Marshall Field Building would suffer no major injury other than burns. Contrary to defendant's assertion, a holding of liability is not a holding that a manufacturer has a duty "to design and build a crash-proof vehicle."

II.

*Availability of Strict-Liability Theory*

■ Plaintiff in this case proceeded upon the theory of strict liability adopted in Suvada v. White Motor Co., 32 Ill.2d 612, 210 N.E.2d 182 (1965). In order to recover against the manufacturer under that theory, plaintiff must prove that his injury "resulted from a condi-

---

4. The last phrase is from a passage in Prosser, Palsgraf Revisited, 52 Mich.L.Rev. 1, 27 (1953), quoted in Mieher v. Brown, 54 Ill.2d at 545, 301 N.E.2d at 310.

5. One eyewitness estimated 10 m. p. h. for the first impact. The driver of the Rambler testified that, although she was traveling at 40 m. p. h. when she first saw the Cortina, she braked before impact and felt her brakes grab.

tion of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control." 32 Ill.2d at 623, 210 N.E.2d at 188; Taylor v. Carborundum Co., 107 Ill.App.2d 12, 18, 246 N.E.2d 898, 901 (1st Dist. 1969); Nolan v. Shaf Mfg. Co., 128 Ill.App.2d 19, 29, 261 N.E.2d 209, 213 (3rd Dist. 1970).

In *Mieher* the Illinois Supreme Court held that the complaint did not state a cause of action on a strict-liability theory because it failed to allege that the product was in the same condition at the time of the accident as it was when it left defendant's possession. The court, therefore, viewed the claim as sounding in common-law negligence. There is no reason to doubt, however, that the Illinois Supreme Court would hold the reach of the manufacturer's duty to the "second collision" victim to be the same under either theory.

### Existence of the Condition at the Time the Automobile Left Defendant's Control

█ It was stipulated in the case at bar that up to the time of the accident plaintiff's Cortina was in essentially the same condition as when sold. Defendant did not argue in its briefs in this court that the stipulation was insufficient to establish that fact or dispute that fact in any way. Rather, its argument was that the collision with the Oldsmobile changed the Cortina's condition before the injury to plaintiff, and therefore the same-condition requirement was not satisfied.[6] We were advised for the first time on oral argument that the stipulation was not read to the jury. Since the parties tried the case on the theory that the vehicle was in the same condition immediately before the collision with the Oldsmobile as it was when it left defendant's control, they are bound by that theory here, United States v. Home In-

demnity Co., 489 F.2d 1004, 1007–1008 (7th Cir. 1973); Ellsworth Freight Lines, Inc. v. Coney, 376 F.2d 475, 478 (7th Cir. 1967); Wagner v. Retail Credit Co., 338 F.2d 598, 601–602 (7th Cir. 1964); cf. Hormel v. Helvering, 312 U.S. 552, 556–559, 61 S.Ct. 719, 85 L.Ed. 1037 (1941), even though plaintiff neglected to read the stipulation to the jury. The presence of the other elements of a *Suvada* claim, injury proximately caused by an unreasonably dangerous condition, is discussed in Part III below.

### Strict Liability for a Design Defect

At the threshold defendant contends that plaintiff has not pleaded or proved a cause of action in strict liability because Illinois law does not permit the application of "a theory of strict liability in tort to a case sounding in design negligence." In making this contention defendant seizes upon a sentence in the opinion of the Appellate Court in Mieher v. Brown, 3 Ill.App.3d 802, 805, 278 N.E.2d 869, 872 (5th Dist. 1972), reversed on other grounds, 54 Ill.2d 539, 301 N.E.2d 307 (1973), and ignores several Illinois cases squarely contrary to its contention. Sutkowski v. Universal Marion Corp., 5 Ill.App.3d 313, 281 N.E.2d 749 (3rd Dist. 1972); Rivera v. Rockford Mach. & Tool Co., 1 Ill.App.3d 641, 274 N.E.2d 828 (1st Dist. 1971); Dunham v. Vaughn & Bushnell Mfg. Co., 86 Ill. App.2d 315, 229 N.E.2d 684 (4th Dist. 1967); Wright v. Massey-Harris, Inc., 68 Ill.App.2d 70, 215 N.E.2d 465 (5th Dist. 1966). As the court said in the *Wright* case (68 Ill.App.2d at 79, 215 N.E.2d at 470):

> ". . . we interpret *Suvada* to mean that the strict liability imposed upon a manufacturer includes injuries which arise from defects in design as well as defects in manufacture."

█ The sentence in the Appellate Court's opinion in Mieher v. Brown relied upon by defendant[7] appears in the

---

**6.** This argument suggests the unrealistic view that in inferring the Cortina was unreasonably dangerous in its original condition, the effects of the Oldsmobile and Rambler collisions cannot be considered cumulatively. We have already observed that the sequence of the two collisions was not extraordinary or bizarre.

**7.** "To put the matter bluntly, there is no cause of action in this state for strict liability in tort for negligent design." 3 Ill.App.3d at 805, 278 N.E.2d at 872.

context of an explanation that negligence and strict liability in tort are "separate and distinct causes of action" which the plaintiff's pleading had erroneously combined in an "admixture of language and theory." (3 Ill.App.3d at 805, 278 N.E.2d at 872.) It would be a strange rule that would immunize the manufacturer of a product from strict liability in tort if the unreasonably dangerous condition of his product was the result of a design defect rather than negligence in manufacturing or inspection. We are satisfied that Illinois has not adopted such a rule.

## III.

### Sufficiency of the Evidence

Given the duty of defendant as we have defined it, the applicability of the strict-liability theory, and the absence of an issue as to whether the car was in the same condition as it was when it left defendant's control, there remain the unreasonably-dangerous-condition and probable-cause issues. If there was evidence from which the jury could find that an unreasonably dangerous condition existed in the Cortina by reason of its design, and that the fire that caused plaintiff's burns, or the instantaneous spread of that fire into the passenger compartment, resulted from that condition, plaintiff's prima facie case was complete, and the jury's verdict is supported by the evidence.[8]

Plaintiff called two experts, whose combined testimony, viewed in the light most favorable to him, showed in substance that the fuel-filler neck of the 1967 Cortina tended to pull loose and be displaced into the trunk; that the fuel tank was "susceptible to distortion" because of its location in the frame; that the fuel tank, filler neck and cap were located in an extremely vulnerable position; and that these conditions created

an unreasonable danger of fire in the event of collision. Their testimony also showed that there was no firewall between the fuel tank and the passenger compartment; and that this condition created an unreasonable danger that a fire in the area of the fuel tank resulting from a collision would spread into the passenger compartment before the occupants of the car could escape or be extricated. The causal relationship between one or both of these unreasonably dangerous conditions and plaintiff's injuries was shown prima facie by expert opinion testimony that the small fire after the first impact was caused by the design and location of the filler pipe; that this fire was spread by a gross leakage of fuel after the second impact; and, in the words of one of plaintiff's expert witnesses, that "the lack of isolation of the fuel-tank area from the passenger compartment allowed a very rapid spread of this fire in the interior of the car, thus preventing rescue personnel from evacuating the driver before he suffered serious burns."

The evidence of plaintiff's experts was confirmed by the deposition testimony of one of defendant's own engineers who had been assigned by defendant to investigate accidents involving 1967 Cortinas in England, one of which involved a fuel fire. In his report on this accident he referred to a similar occurrence in the United States and concluded that the bursting of the fuel tank and immediate conflagration in the latter accident "indicate that the floor mounted tank is hazardous and should be carefully reviewed and tested in each new model."

Not surprisingly, there are sharp contradictions in the evidence. Resolving these conflicts was the jury's responsibility. Our role in reviewing the denial of defendant's motion for directed verdict ends when we determine, as we have, that the evidence favorable to

---

8. Defendant was not entitled to a directed verdict unless "the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." Pedrick v. Peoria E. R.R., *supra,* 37 Ill.2d at 510, 229 N.E.2d at 513–514. The *Pedrick* rule is applicable in a diversity case. See, *e. g.,* Risse v. Woodard, 491 F.2d 1170, 1171 (7th Cir. 1974).

plaintiff, although contradicted, is sufficient to support the jury's verdict under the applicable Illinois law.[9] We turn now to the claims of trial error.

## IV.

### Alleged Trial Errors

A. *Expert Testimony*

1.

■ We are told that the district judge refused to allow defendant to cross-examine plaintiff's experts, William Stieglitz and Paul O'Shea, "with respect to their qualifications as 'expert' witnesses," but we are not referred to the pages of the joint appendix or the record where this is supposed to have occurred. We have examined the transcript of the testimony of these witnesses and conclude that defendant was not prejudiced in its cross-examination.

2.

■ Plaintiff's experts did not inspect the vehicle after the accident. Defendant argues that "an actual examination of the vehicle or at a bare minimum some physical evidence is absolutely essential" as a basis for expert testimony. There is of course no such rule. The evidence showing the circumstances of the accident and the design of the car was sufficient to permit an expert to express an opinion as to the cause of the fire. That the expert did not have the advantage of an inspection of the vehicle goes to the weight of his testimony, not its admissibility.

■ Similarly, defendant's contention that Stieglitz was not shown to be sufficiently knowledgeable about the Cortina or automotive design problems goes to the weight of his testimony.

3.

■ The argument that Stieglitz based his testimony on "pure specula-tion" rests on his inability to say exactly how the small amount of leakage that in his opinion caused the small fire after the first collision occurred. He explained the various possibilities and concluded,

"There is no way of telling what happened. There was something that permitted a small degree of leakage."

The competency of Stieglitz's opinion on causation did not depend on his ability to state the precise place at which the leak of gasoline from the filler pipe occurred. Experts frequently must determine the causes of accidents by drawing inferences after the event from such evidence as is available. Frequently circumstances make it impossible to state all the details of the occurrence with absolute certainty. It is enough that the expert opinion be supported by a rational explanation which reasonable men could accept as more probably correct than not correct.

4.

Next it is contended that the hypothetical question put to Stieglitz included statements not supported by the evidence, *viz.,* that the Oldsmobile struck the right corner of the Cortina, and that a fire the size of a grapefruit began "in the area around the right rear section where the gasoline cap is located." Defendant points out that the driver of the Oldsmobile and a passenger in that car testified that the impact occurred at the Cortina's left rear. The stipulation of fact, however, which as we noted above was inexplicably not read to the jury, stated that the Oldsmobile struck "the right rear of the Cortina." Defendant also points out that the driver of the Rambler, who alone testified she saw the grapefruit-sized fire, testified she saw it on the right lower rear, whereas the gasoline cap, says defendant, "was in fact located at the mid to upper rear section of the Cortina—not the lower rear."

---

9. Considered as a basis for new trial, defendant's contention that the verdict was against the manifest weight of the evidence is equally without merit. A motion for new trial on this ground is addressed to the sound discretion of the district judge, and his ruling is non-reviewable except for an abuse of discretion (6A J. Moore, *Federal Practice* ¶ 59.08 [5]), which we do not find here.

The objections now made to the hypothetical question were not asserted at the time the question was asked, or indeed at any other time during the trial. The objections that counsel for defendant did make at the trial were obviated by an amendment to the question. If the objections now asserted had also been made then, they too might have been obviated. By not making them then, defendant waived them. His contention that the District Court erred in allowing Stieglitz to answer the hypothetical question containing these alleged inaccuracies is therefore without merit.

There remains the issue of the probative value of Stieglitz's answer, if the hypothetical question contained errors of fact. Defendant having stipulated that the Oldsmobile struck the right rear of the Cortina, plaintiff tried the case on the assumption that this was the fact. Defendant's failure to seek to withdraw the stipulation, coupled with its failure to object to the inclusion of the stipulated fact in the hypothetical question, estops it from now questioning the sufficiency of the evidence of that fact. Cf. Hoosier Home Improvement Co. v. United States, 350 F.2d 640, 644 (7th Cir. 1965). Moreover, even if the initial impact of the Oldsmobile was with the left rear of the Cortina, the testimony concerning the small fire was that it appeared on the right side, the side on which the gasoline cap was located. This was consistent with the plaintiff's theory that the initial collision caused a small gasoline leakage which in turn caused the initial, small fire. In any event, even if the fire initially started with the second impact and, because of the absence of a firewall, burst into the passenger compartment before plaintiff could escape or be rescued, the jury could have found liability.

With respect to the statement in the hypothetical question that the fire was "in the area around the right rear section where the gasoline cap is located," defendant's attempt to distinguish between "the lower rear," where the driver of the rambler testified she saw the fire,

and the "mid to upper rear section," where defendant says the cap was placed, is no more than a quibble. The cap is below the bottom of the trunk lid, and its location could properly be described as the "lower" rear of the car.

### 5.

Defendant complains that Stieglitz's testimony that a firewall would have prevented the spread of fire to the interior of the vehicle long enough to have permitted the rescue personnel to get the driver out before suffering major burns was based on hearsay, consisting of a report of the National Advisory Committee for Aeronautics (predecessor to the National Aeronautics and Space Administration) entitled "Appraisal of the Hazards to Human Survival in Airplane Crash Fires." When the witness said he had based his opinion in part on this report and started to testify about what the report said, counsel for defendant objected and the court sustained the objection. We pass over counsel's failure to specify a ground for his objection, since the court appears to have inferred the ground now asserted. But counsel did not move to strike the opinion itself, which had been stated several questions and answers earlier and which he now says should have been stricken. He therefore cannot complain here of the court's failure to strike it. The court gave counsel all the relief he asked for.

Even if a motion had been made, however, the court could properly have denied it. Facts or data found in the literature of the profession, even though not themselves admissible in evidence, properly form a part of the basis for an expert's opinion. 2 J. Wigmore, Evidence § 665b (3d ed. 1940); Proposed Federal Rules of Evidence, Rule 703, H.R. 5463, 93d Cong., 2d Sess., Rule 703; see also Rivera v. Rockford Mach. & Tool Co., *supra*, 1 Ill.App.3d at 649–650, 274 N.E.2d at 834.

### 6.

Defendant contends that a mistrial should have been granted because

Stieglitz, using a Cortina gas tank and filler-neck assembly in making a demonstration to the jury, did not use the steel clamps with which the filler tank was affixed to the gas tank when the assembly was installed in a Cortina automobile. Stieglitz struck the filler neck with his hand, causing it to disengage from the tank, which would not have occurred, says defendant, if the clamps had been in place. The record shows that the district judge carefully considered the motion for mistrial and in denying it observed that the jury had been advised that the clamps had been removed, and concluded that they were not misled. His ruling was correct.

### 7.

Defendant complains that the District Court allowed plaintiff to reopen his case in chief, after the close of defendant's case, to call expert witness O'Shea. This was a matter within the trial court's discretion, reviewable only for abuse, which we do not find. Defendant had an adequate opportunity to prepare to cross-examine O'Shea, since it had taken his deposition and he was listed in the final pretrial order as a prospective witness. We need not review here the dispute between the parties concerning his availability during plaintiff's case in chief. The trial judge was justified in accepting the representation of plaintiff's counsel on that subject, which defendant's counsel did not question at the time, and the record before us does not provide any basis for finding that representation to have been inaccurate.

Defendant also complains that the trial court allowed it to call only one witness to rebut O'Shea's testimony. This exercise of discretion by the judge was not an abuse absent a showing of prejudice. Since no offer of proof was made, there is no basis for a finding of prejudice. A party cannot raise as error the exclusion of evidence unless its substance was made known to the judge by offer or was apparent from the context. Proposed Federal Rules of Evidence, Rule 103(a)(2) states this well-settled rule.

### 8.

O'Shea was allowed to testify about a test he conducted on "the back-half" of a 1967 Ford Cortina, mounted on a sled, in which he caused a ram mounted on another vehicle to strike the test vehicle. Defendant objected that the test did not duplicate the essential conditions of the accident. The test, however, did not purport to be a reconstruction of the accident but was for the limited purpose of demonstrating that an impact of a given force could dislodge the fuel-filler pipe from the rear panel. It was not required, therefore, that the conditions of the accident be duplicated, Johnson v. Chicago & N. W. Ry., 9 Ill. App.2d 340, 355–356, 132 N.E.2d 678, 686 (2d Dist. 1956); Skalon v. Manning, Maxwell & Moore, Inc., 127 Ill.App.2d 145, 162–163, 262 N.E.2d 146, 155 (1st Dist. 1970); McCormick, Evidence 486–487 (Cleary ed. 1972).

### 9.

Plaintiff, at the time he asked leave to reopen to call O'Shea, also sought to introduce with O'Shea's testimony a motion picture of the test and the test vehicle. Defendant objected to allowing O'Shea to testify and to all evidence concerning the test. After hearing counsel and viewing the motion picture, the court ruled that he would admit O'Shea's testimony but would exclude the motion picture and the test vehicle, since defendant had not offered movies or test vehicles in connection with tests its experts had described to the jury. Defendant then sought to use the motion picture and test vehicle itself in cross-examining O'Shea. The court denied that request.

Defendant argues that the motion picture would have shown that the bar on the filler cap was not horizontal but nearly vertical, which meant that the cap was not screwed into the fixed position and therefore any jar would have knocked it off. O'Shea, however, con-

ceded on cross-examination that the bar was not horizontal in his experiment. The real dispute on this point at the trial was whether all Cortina filler caps were made in such a way that the filler-cap bar was horizontal when the cap was screwed on tight. The motion picture did not, of course, throw any light on this issue. Similarly, other points defendant says would have been demonstrated by the motion picture or the test model were adequately brought out without them. When O'Shea was asked on cross-examination whether the amount of fuel discharged was less than a cup, he acknowledged that was so. Turning to matters not called to the trial court's attention but brought up for the first time here, O'Shea also conceded that there was no damage to the rim of the hole where the filler neck passes through the rear panel of a kind that would occur if the neck was pulled through with the cap affixed and that there was no damage or distortion to the tube itself. The trial court's refusal to allow the use of the motion picture and the test model in the cross-examination of O'Shea did not affect the substantial rights of the parties. See Rule 61, F.R. Civ.P.

## B. *Use of Deposition*

■ Defendant's final complaint of error in rulings on evidence is that the District Court allowed plaintiff to read the deposition of a non-party witness who was present in the courtroom. It appears that when plaintiff's counsel first announced his intention to read the deposition on Monday, June 19, the witness was at his home outside the 100-mile limit. See Rule 32(a)(3), F.R.Civ.P. By the time counsel got around to reading the deposition, on Wednesday, June 21, defendant had brought the witness to Chicago. The witness then being available, Rule 32(a)(3) did not authorize the reading of his deposition. The error,

however, was harmless. Defendant does not argue that it was prejudiced, merely that the rule was violated.

## C. *Instructions*

Finally defendant objects to the giving of several instructions to the jury and the failure to give others tendered by defendant.

■ Defendant argues that the instructions failed to tell the jury that if the conduct of a third person was the sole proximate cause of plaintiff's injury, he cannot recover from the defendant. This proposition was adequately communicated to the jury in the instructions that were given, although not in the words defendant asked the court to use. No particular form of words was required, so long as the idea was conveyed.

■ Defendant argues that certain instructions were "peremptory and contained conclusions." At the trial, however, the grounds of objection to these instructions were entirely different. The burden-of-proof instruction is also attacked on grounds different from those stated at the trial. New grounds may not be asserted for the first time here. Rule 51, F.R.Civ.P.

■ Defendant also complains of the court's refusal to give one of the two alternative burden-of-proof instructions it tendered. In at least two respects either of these proposed instructions might have been confusing to the jury. Each of them told the jury plaintiff had to prove that the dangerous condition existed when the car left defendant's control. That issue, however, had been stipulated out of the case, and defendant did not, as we observed earlier, ask to be relieved from that stipulation or suggest to the trial judge that it was inaccurate. In addition, each of the proposed instructions, by modifying the words "unreasonably dangerous condition" with the phrase "when put to its intended use," [10]

---

10. That phrase does not appear in what purports to be a quotation from defendant's instruction 5 in defendant's brief. The brief contains no supporting record or appendix reference. The defendant's tendered and refused instructions do not appear to be included in the record on appeal, but defendant's post trial motion purports to quote defendant's instructions 5 and 5A in full, and the phrase "when put to its intended use" appears in both those instructions.

might have been construed by the jury to exclude a condition that is unreasonably dangerous only if a collision occurs, since a collision was not "an intended use." Thus the "intended use" qualification, appropriate in some contexts, would in this case have introduced semantic confusion and would have been likely to mislead the jury as to the law. The instructions that were given the jury on the issues and burden of proof adequately informed them of the law applicable to the case.

In its reply brief, defendant adds what appears to be still another objection, viz., that the instructions as a whole fail to instruct the jury "on the law attendant to a 'second collision' case." This objection comes too late.

The judgment of the District Court is affirmed.

Affirmed.