**Javier VELIZ, Plaintiff,**

v.

**CROWN LIFT TRUCKS, Defendant.**

**No. CV 84–2746.**

United States District Court,
E.D. New York.

June 1, 1989.

Richard Leotta and Joseph Napoli, Morris J. Eisen, P.C., New York City, for plaintiff.

J. Joseph Bainton and William Dunnegan, Shea & Gould, New York City, for defendant.

MEMORANDUM AND ORDER

DEARIE, District Judge.

This matter is before the Court on plaintiff's motion to set aside the judgment and for a new trial, and defendant's motion for sanctions. For the reasons set out below, plaintiff's motion is denied and defendant's motion for sanctions is granted.

## I. Motion to Set Judgment Aside and For a New Trial

### A. *Demonstrative Evidence*

■ Plaintiff commenced this products liability action against defendant Crown Lift Trucks ("Crown") seeking to recover for injuries sustained in the operation of one of defendant's lift trucks. Relying on theories grounded in negligence, breach of warranty, and strict products liability, plaintiff claimed that defendant's lift truck was defective because, *inter alia*, the stopping distance of the truck was excessive and because Crown did not install a door on the operating compartment of the lift truck used by plaintiff. The jury found for the defendant on all of plaintiff's claims.

During the trial, the Court permitted, over plaintiff's objection, a live demonstration of the operation of a lift truck that was substantially similar, but not identical, to the truck operated by the plaintiff at the time he sustained his injuries. In addition, the Court admitted, again over plaintiff's objection, certain videotapes, which depicted a lift truck carrying loads of varying weights to demonstrate the physical and mechanical principles involved in the braking of lift trucks. The brief, live demonstration, which was conducted under the supervision of the Court in the basement of the courthouse, was permitted to familiarize the jury with the operations of lift trucks in general and was accompanied, before and after, with specific instructions to the jury.

Plaintiff contends that the demonstration and videotapes were cumulative and prejudicial. Further, plaintiff complains that the jury was not given a "list" of the similarities and differences between the demonstrations and the actual conditions.

It is, of course, firmly established that the decision whether to admit evidence of experimental tests or demonstrations is a matter left to the sound discretion of the trial judge. *See Szeliga v. General Motors Corp.*, 728 F.2d 566, 567 (1st Cir.1984); *Randall v. Warnaco, Inc.*, 677 F.2d 1226, 1233 (8th Cir.1982). "[A] court may properly admit experimental evidence if the tests were conducted under conditions substantially similar to the actual conditions. Admissibility, however, does not depend on perfect identity between actual and experimental conditions. Ordinarily, dissimilarities affect the weight of the evidence, not its admissibility." *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1278 (8th Cir.1987). *See Szeliga v. General Motors Corp.*, *supra*, 728 F.2d at 567; *Nanda v. Ford Motor Company*, 509 F.2d 213 (7th Cir.1974); *Millers' Nat. Ins. Co. v. Wichita Flour Mills Co.*, 257 F.2d 93, 99–100 (10th Cir. 1958). The notion underlying the admission of such evidence in a products liability case is that it fosters a better understanding by the jury of the product, issues, and often abstruse expert testimony involved. As one treatise writer notes succinctly, such evidence "may be strikingly effective in adding vividness to the spoken word." *McCormick on Evidence* § 215, at 536 (Cleary ed. 1972). *See also Millers' Nat. Ins. Co.*, 257 F.2d at 99 (demonstrative evidence used as a means to "enable or assist the [expert] witness to make an understandable communication of admissible matter with reasonable accuracy and expedition").

To be sure, there are certain dangers inherent in the admission of demonstrations, as there exists the possibility of juror confusion about the precise purpose of the demonstrations. Courts have recognized, however, that when accompanied by limiting instructions or testimony detailing the dissimilarities between the demonstration and actual conditions, it is not error to admit demonstrations that are substantially similar to, but do not mirror, the actual conditions involved. *See Champeau, supra*, 814 F.2d at 1278; *Nanda, supra*, 509

F.2d at 223; *Millers' Nat. Ins. Co., supra,* 257 F.2d at 99.

For instance, in *Champeau,* plaintiff, who was injured while operating one of the defendant's trucks, claimed that the braking system on the truck was defective. The defendant proffered a videotaped experiment designed to show that, under the applicable laws of physics, the accident could not have occurred as the plaintiff had described it. Although there existed certain dissimilarities between the experiment and the actual conditions, the trial court admitted the experiment along with a written list of the differences and similarities. On appeal, the court held that, in light of the similarities in conditions and the list of differences and similarities, it was not error for the trial court to admit the videotaped experiment. 814 F.2d at 1278. The court also noted that "the experiment did not need to be performed in similar circumstances in order to be admissible because it did not purport to be a recreation of the accident and it was merely used to demonstrate general principles of physics as applied to [plaintiff's] testimony." *Id.*

Similarly, in *Nanda,* the plaintiff was injured when his car became engulfed in flames following a rear-end collision. Plaintiff alleged that the fire was attributable to a design flaw in the placement of the fuel tank. At trial, plaintiff's expert was permitted to make a demonstration in which he struck with his hand the filler-neck of the gas tank of the car involved, causing it to disengage from the gas tank. In performing the demonstration, plaintiff's expert had removed steel clamps with which the filler-neck was affixed to the gas tank when assembled. Defendant moved for a mistrial on the ground that the filler-neck would not have disengaged had the filler-neck and gas tank used in the demonstration been held together by the steel clamps, as were the filler-neck and gas tank of the car involved in the accident. The Seventh Circuit upheld the denial of the mistrial motion, noting that the jury had been advised that the clamps had been removed and thus the demonstration did not mirror the actual conditions involved. 509 F.2d at 223. *See also Millers' Nat.*

*Ins. Co., supra,* 257 F.2d at 99–100 (no error in admitting films of experiments that were not performed under similar conditions but were admitted with cautionary instruction that they were being admitted only for the purpose of illustrating certain principles that the plaintiff contended were applicable in the case).

In the case at bar, the videotapes and the demonstration were substantially similar to the actual conditions. Stated another way, given the limited purposes of the demonstrative evidence, the dissimilarities that did exist were essentially meaningless. Further, although it was not given a written "list," the jury was made fully aware of the dissimilarities between the conditions depicted on the videotape and those of the accident. Mr. Dunlap, defendant's expert, under examination by plaintiff's counsel during a voir dire preceeding the admission of the videotapes, testified that (1) the vehicle used in the videotapes was not the one involved in the accident, (2) the model used in the videotapes had disc brakes rather than the drum brakes of the accident vehicle, and (3) none of the tests was run in reverse even though the accident occurred in reverse. *See* Transcript, at 621–23. Moreover, the Court cautioned the jury as follows:

All right, ladies and gentlemen, I want you to listen carefully because these instructions are important.

The videotapes you are about to view are being admitted for a limited purpose. You may not consider them for any other purpose. The videotapes are admitted for the sole purpose of aiding you in your understanding of that portion of Mr. Dunlap's testimony relating to certain physical principles, mechanical principles which were during the course of his testimony at times expressed in the mathematical terms. Now, I emphasize to you and it is very important that you listen to this and remember these tapes do not depict nor are they intended to depict the circumstances of Mr. Veliz's accident. This is not recreation in any sense of the word of that accident. These tapes are merely a guide to you to

follow Mr. Dunlap's testimony. By themselves they prove nothing.

You must bear these instructions in mind as you view the tapes and during the course of your deliberations.

Transcript, at 628–29. As to the admission of the live demonstration, the Court cautioned the jury as follows:

Ladies and Gentlemen, my usual practice and I am sure I did it in this case is to tell you at the beginning of the trial that there are a lot of things that happen, as the trial progresses that you won't understand why.

Generally there are reasons for everything and in this instance this delay and interruption this morning is explainable for the following reasons. As part of the defense case, the Court is going to permit the inspection of a machine similar to the one used in the accident by you, the jury, and the demonstration of the machine which will take place downstairs in the basement of the court.

We have been attending to those details now. That is why we have been delayed and again, we appreciate your patience.

Now, you must listen very carefully to these limiting instructions or cautionary instructions because they are very important.

We are not trying to in effect reproduce those conditions that occasion the accident and the injury to Mr. Veliz.

This is not a reenactment of the accident.

Indeed, the machine is not the same machine that was involved in that accident. Obviously, the operator of the machine today will not be the same operator. The brake system employed in this particular machine that you will see in operating briefly today was not the system that was employed at the time of the accident.

The sole purpose of this demonstration is to familiarize you, the jurors, with the operations of the machine so that you will hopefully be better able to follow and weigh the testimony you will hear

and have heard concerning the operations of the machine.

Now, that is very important that you understand that. There is a very limited purpose to this. All right. And that is, just to familiarize you instead of seeing abstract names and hearing abstract descriptions, you are going to actually see the machinery in a limited way in operation. That is it.

Transcript, at 466–68. In light of these cautionary instructions—as well as the plaintiff's opportunity extensively to cross-examine defendant's witnesses regarding the dissimilarities between the demonstrations and the accident—it was not error to admit the videotapes or the courthouse demonstration.

Finally, with respect to the courthouse demonstration, plaintiff's counsel demonstrates his omniscience and rhetorical flare when he urges that the demonstrative evidence utilized in this case "had a decisive, overpowering effect on the minds of the jurors principally contributing to their decision absolving defendant of liability for plaintiff's injuries." Plaintiff's Memorandum of Law, at 7. This enlightening assertion invites the Court's own observations.

In place of abstract principles and a multitude of concepts and images, the jury was carefully provided with concrete information that, without question, enabled them to understand the evidence and appreciate the arguments and positions of both sides. Plaintiff does not attempt to explain how he was prejudiced by the courthouse demonstration. In fact, he was not. On display was a heavy, powerful piece of machinery, with control and steering mechanisms that required skill and training. Even operated by a well-trained and experienced technician, this bulky piece of equipment lurched to and fro in a powerful and somewhat herky-jerky fashion. Clearly this was a piece of serious, heavy-duty equipment, not intended for casual use, but instead for the hard-driven routine of a factory or warehouse setting. It was equally clear that the operation of this vehicle in the limited and potentially dangerous confines of a factory requires special

skill and extensive training. Plaintiff complains now because the demonstration may very well have created the impression that the party most responsible for Mr. Veliz' tragic accident was his employer who commissioned him to operate the lift truck before he was qualified to do so safely. Such an impression likely brings us closer to the truth, but surely plaintiff should not be heard to complain.

### B. *Denial of Right to Jury Selected From Fair Cross Section of the Community*

■ Plaintiff, an hispanic male, argues to this Court *for the first time* that he was denied his right to a jury selected from a fair cross-section of the community because the venire from which the trial jury was chosen was not comprised of a representative cross-section of the community in violation of Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.* ("the Act").[1] This argument is frivolous.

During the jury selection before Magistrate Carol Bagley Amon, plaintiff's counsel apparently[2] objected to the composition of the venire on the ground that hispanics were underrepresented. Plaintiff's counsel, however, chose not to raise the issue with the Court (until the filing of this post-trial motion). More importantly, counsel failed to comply with the procedural requirements of the Act, which are the "ex-clusive means" by which a party may mount a statutory challenge to the composition of a jury on the ground that it is not selected from a fair cross-section of the community. *See* 28 U.S.C. §§ 1867(c)–(e).

In a civil case, the Act requires a party to make a timely motion to stay the proceedings on the ground of substantial failure to comply with the provisions of the Act in selecting the jury. 28 U.S.C. § 1867(c).[3] Furthermore, section 1867(d) mandates that any such motion be made in writing and must be accompanied by a "sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of [the Act]." The legislative history of the Act indicates that Congress considered the sworn statement requirement an important one:

> The final basic safeguard against the dilatory use of challenges is contained in section 1867(d). It requires that the challenge motion be accompanied by a sworn statement of facts which, if true, demonstrate a substantial failure to comply with the statutory guide. This threshold requirement to a successful challenge will make it possible for the judge to review a challenge motion and swiftly dispose of it if it fails, on its face, to state a case for which a remedy could be granted.

---

**1.** Plaintiff does not specifically articulate a sixth amendment challenge to the composition of the venire.

**2.** No transcript of the jury selection was taken. Counsel for Crown concedes, however, that an objection to the composition of the venire was made before Magistrate Amon.

**3.** A "timely" motion within the Act is one made "*before* the voir dire examination begins, or within seven days after the party discovered or could have discovered, by the exercise of diligence, the grounds [for making the motion], whichever is earlier...." 28 U.S.C. § 1867(c) (emphasis added). Although the "whichever is earlier" language of section 1867(c) is not a model of clarity on this point, the legislative history and several cases strongly suggest that section 1867(c) requires that "complaints as to violations of the Act must be made no later than the commencement of voir dire, regardless of the date of actual or imputed knowledge of irregularities in juror selection." *Arbuckle Broadcasters v. Rockwell Intern. Corp.*, 513 F.Supp. 407, 410 (N.D.Tex.1980). *See* H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Admin.News 1792, 1805) ("Subsections (a), (b), and (c) [of section 1867] specify that challenges must be offered before the voir dire begins. And if the challenging party discovered, or in the exercise of diligence could have discovered, the grounds for the challenge earlier, the challenging motion must be made within seven days of that earlier date"); *McGinnis v. M.I. Harris, Inc.*, 486 F.Supp. 750, 753–54 (N.D.Tex.1980) ("regardless of the date of actual or imputed knowledge of irregularities in juror selection, statutory challenges are waived if not made before voir dire"). Our Court of Appeals, however, has interpreted the statute to allow a challenge to be made either before or during the voir dire. *See United States v. Silverman*, 449 F.2d 1341, 1344 (2d Cir.1971), *cert. denied*, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972).

H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Admin.News 1792, 1806. *See also* S.Rep. 891, 90th Cong., 1st Sess. 33 (1967). In light of this legislative history and the express requirements of the statute, courts, including our Court of Appeals, have refused to consider statutory challenges to the composition of venires where the party asserting the challenge fails to submit a sworn statement in connection with the challenge. *See United States v. Young,* 822 F.2d 1234, 1239 (2d Cir.1987); *United States v. Jones,* 480 F.2d 1135, 1139 (2d Cir.1973); *United States v. Deardorff,* 343 F.Supp. 1033, 1043 (S.D.N.Y.1971). *See also United States v. Kennedy,* 548 F.2d 608, 613 (5th Cir.) ("The courts have strictly enforced both the timeliness and sworn statement requirements of § 1867"), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977); *United States v. Grose,* 525 F.2d 1115, 1119 (7th Cir.1975) ("oral observation" of composition of jury insufficient), *cert. denied,* 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976); *United States v. Frumento,* 409 F.Supp. 136, 141 (E.D.Pa.1976), *aff'd,* 563 F.2d 1083 (3d Cir. 1977), *cert. denied sub nom. Millhouse v. United States,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978). *See generally* Annotation, *Construction and Application of Provisions of Jury Selection and Service Act of 1968 (28 USCS §§ 1861–1867) Governing Plans For, And Manner of, Selecting Federal Grand and Petit Jurors,* 17 A.L.R. Fed. 590, 625 (1973 & Supp. 1988). Since plaintiff submitted no written motion or sworn statement, his challenge pursuant to the Act must fail.

■ Even if plaintiff had properly asserted statutory or constitutional challenges to the composition of the venire, those challenges would fail because plaintiff has not made out a *prima facie* case under the appropriate standards.

First, statutory relief is available only if a party demonstrates a *substantial* failure to comply with the provisions of the Act. *See* 28 U.S.C. § 1867(d). Plaintiff has submitted no testimony, papers or documents, *see id.,* tending to show that the provisions of the Act were not substantially followed.

*Cf. United States v. Armsbury,* 408 F.Supp. 1130, 1134 (D.Or.1976) (in order to sustain burden of proof, party "must present facts and figures, not general allegations").

Second, in order to establish a *prima facie* violation of the Sixth Amendment's fair cross section requirement, a party must establish:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). *See McGinnis v. M.I. Harris, Inc.,* 486 F.Supp. 750, 755 & n. 4 (N.D.Tex.1980) (assuming the *Duren* test applies in civil setting). *See Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975). In his motion papers, plaintiff notes only that he is a member of a distinctive group and claims, without any evidentiary support, that only one of the forty persons in the venire from which the jury was chosen was hispanic. (Defendant challenges this latter assertion.) Plaintiff, however, ignores the second prong of the *Duren* test, as he has submitted no statistical evidence with respect to (1) the number of hispanics in the Eastern District of New York, (2) the number of hispanics in the venires in the Eastern District at the time of trial, or (3) the number of hispanics in the jury pool from which the venire in this case was selected. Since the burden is on the party challenging the jury selection process to present statistical proof of underrepresentation, *see United States v. Brady,* 579 F.2d 1121, 1134 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979), plaintiff's challenge must fail.

Furthermore, even assuming that plaintiff satisfied the first two prongs of the *Duren* test, there is no proof that the jury selection system of the Eastern District of

New York results in the systematic exclusion of hispanics in the jury selection process. The system employed by the Eastern District of New York is as follows: venires are comprised of registered voters *and* licensed drivers whose names are randomly chosen and placed in a "master jury wheel." A "qualified jury wheel" is then created by grouping those persons who return the juror qualification form randomly sent to the individuals in the master jury wheel. The clerk then randomly selects from the qualified jury wheels the jury panels to serve at particular sessions of the court. *See Plan of the United States District Court for the Eastern District of New York for the Random Selection of Grand and Petit Jurors* (on file with the Clerk of the Court). As this brief description makes clear, the whole process is accomplished by random selection.

Our Court of Appeals has noted that "the use of voter registration lists as the sole source of the names of potential jurors is not constitutionally invalid, absent a showing of discrimination in the compiling of such voter registration lists." *United States v. Young, supra,* 822 F.2d at 1239 (quoting *United States v. Gordon,* 493 F.Supp. 814, 810–21 (N.D.N.Y.1980), *aff'd,* 655 F.2d 478 (2d Cir.1981)). *See United States v. Biaggi,* 680 F.Supp. 641, 657 (S.D. N.Y.1988) ("Defendant has not cited, and the court has been unable to locate, a single case invalidating a jury selection system that uses voter registration lists as the sole source of prospective jurors"). Plaintiff has not alleged either discrimination in the compilation of the voter lists or that use of the voter lists in conjunction with licensed driver lists is discriminatory. Accordingly, his challenge must fail.

## II.  Sanctions

### A.  *Introduction*

Crown seeks sanctions against plaintiff's counsel for various actions taken in the pre-trial, trial, and post-trial proceedings. The Court approaches the "distasteful" issue of sanctions, *Oliveri v. Thompson,* 803 F.2d 1265, 1271 (2d Cir.1986), *cert. denied sub nom. County of Suffolk v. Graseck,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987), with great unease. As plaintiff's counsel correctly points out, "[t]he imposition of sanctions is a serious matter and should be approached with circumspection." Memorandum of Law in Opposition to Motion for Sanctions, at 8 (quoting *O'Connell v. Champion International Corp.,* 812 F.2d 393, 395 (8th Cir.1987)). An attorney's name and reputation are his stock in trade and thus any unfair or hasty sullying of that name strikes at the sanctioned attorney's livelihood. *See F.D.I.C. v. Tekfen Construction and Installation Co.,* 847 F.2d 440, 444 (7th Cir.1988). These considerations suggest that, wherever possible, doubts should be resolved in counsel's favor. The Court has taken considerable time to review the full record of the proceedings, the papers, and the transcript of the oral argument. The passage of time may have restored some welcomed objectivity to the Court's analysis of the issues presented, leaving, the Court nevertheless committed to the regrettable conclusion that severe sanctions must be imposed.

### B.  *Determining Who's Liable*

■ Before taking up the specific allegations in Crown's elaborate and enthusiastic application, the Court must identify plaintiff's counsel for the purposes of this sanctions motion. Plaintiff initially was represented by the law firm of Horenstein, Josepher & Gewanter, P.C. ("the Horenstein firm"), which filed this action in the Queens County Supreme Court. After Crown removed the action to this Court, the law firm of Morris J. Eisen, P.C. ("the Eisen firm"), effectively relieved the Horenstein firm and took over prosecution of the action,[4] even though the Horenstein and Ei-

---

4. Documents filed with the Court as early as 1984 indicated that the Eisen firm was taking over and would try the case. *See* Plaintiff's Demand for Trial by Jury dated August 1, 1984. Moreover, the Eisen firm agreed in 1984 that either Mr. Napoli or a Mr. Fishman, both of the Eisen firm, would be the actual trial lawyer. *See* Letter from Peter Horenstein to Mr. Eisen dated July 26, 1984. *See also* Affirmation of Peter Horenstein dated February 19, 1988

sen firms never formally effected a substitution of attorneys as is required by Local Rule 3(c).[5]

In its sanctions motion, Crown seeks sanctions against both plaintiff's counsel even though all of the allegedly sanctionable conduct was engaged in by the Eisen firm. Crown argues that such sanctions are warranted because the Horenstein firm remained plaintiff's counsel of record and thus should be responsible for the overall conduct of plaintiff's attorneys in this action. This Court disagrees.

Although it is correct that the Horenstein firm never was relieved as counsel, it took no part in the conduct that is the subject of this sanctions motion. As has been noted in an analogous context, "in the absence of an indication of active participation [in the sanctionable conduct] it does not seem appropriate to subject [non-offending co-counsel] to sanctions other than criticism for their apparent neglect." *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 103 F.R.D. 124, 125 n. 1 (N.D.Cal.1984), *rev'd on other grounds*, 801 F.2d 1531 (9th Cir.1986). Accordingly, although the firm's indifference to Local Rule 3(c) invites appropriate criticism, the Horenstein firm will not be further sanctioned by the Court.

### C. *Sanctions Allegations*

#### 1. Frivolous Argument in the Motion For a New Trial

■ As noted above, plaintiff's argument based on the Jury Selection and Service Act is frivolous because it is procedurally barred and because counsel failed to tender specific facts to demonstrate a substantial failure of the Eastern District of New York to comply with provisions of the Act. Indeed plaintiff's counsel did not even broach the issue with this Court until

this post-trial motion. Crown argues that sanctions should be imposed against plaintiff's counsel pursuant to Rule 11, Fed.R. Civ.P., or 28 U.S.C. § 1927, for pressing its argument because "[i]t is painfully clear that plaintiff's counsel made no inquiry into the facts necessary to support the fair cross section violation claim." Defendant's Memorandum in Opposition to Plaintiff's Motion to Set Aside Judgment and For a New Trial, at 40.

Rule 11 "was intended to 'discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses.'" *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1469 (2d Cir.1988) (quoting Fed. R.Civ.P. 11 advisory committee's note to 1983 amendment). *See generally* Cavanagh, *Developing Standards Under Amended Rule 11 of the Federal Rules of Civil Procedure*, 14 Hofstra L. Rev. 499, 511–13 (1986). By signing a particular pleading, motion or paper, the attorney certifies that he or she

> has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Fed.R.Civ.P. 11. In *Calloway, supra*, the Court reiterated that the "formed after a reasonable inquiry" language of Rule 11 imposes an objective test for determining whether sanctions are appropriate; subjective "good faith" no longer provides a safe

---

("[w]hen defendant moved in the instant case for a change of venue from Supreme Court Queens County to the Federal District Court, I engaged the office of Morris Eisen as trial counsel, and requested the personal involvement of Mr. Napoli or Mr. Fishman, both of whom were known to us as highly skillfull trial lawyers in Mr. Eisen's office").

**5.** Local Rule 3(c) provides as follows:

(c) An attorney who has appeared as attorney of record for a party may be relieved or displaced only by order of the court and may not withdraw from a case without leave of the court granted by order. Such an order may be granted only upon a showing by affidavit of satisfactory reasons for withdrawal or displacement and the posture of the case, including its position, if any, on the calendar.

harbor from sanctions. 854 F.2d at 1469 (citing *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985) ("*Eastway I*"). *See also Oliveri v. Thompson, supra,* 803 F.2d at 1275. *But see Eastway Construction Corp. v. City of New York*, 637 F.Supp. 558, 566–67 (E.D.N.Y.1986) (Weinstein, J.) (arguing that Rule 11 has both objective and subjective components), *modified,* 821 F.2d 121 (2d Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Under the objective standard, sanctions should be imposed "whenever a pleading [or motion] has been 'interposed for any improper purpose, *or where,* after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.'" *Calloway, supra,* 854 F.2d at 1469 (quoting *Eastway I*).

Plaintiff's post-trial attack on the jury selection process is not well-grounded in fact or warranted by existing law. Any competent attorney would have realized that various threshold procedural hurdles must be cleared in order to sustain a challenge under the Act. Furthermore, any competent attorney would have recognized that a challenge under the Act imposes substantial factual burdens on those asserting the challenge. Plaintiff's counsel, however, ignored the procedural requirements of the Act and attempted no factual investigation. He offered only his self-serving observation of the composition of the venire at the time of the jury selection.

As obvious as this conclusion is, it does not necessarily end the inquiry or necessitate the imposition of sanctions. Some uncertainty lingers over the question of whether sanctions must be imposed when one argument in an otherwise non-frivolous motion is found to be utterly groundless. Although the Second Circuit has apparently not yet directly addressed the issue, *see Calloway v. Marvel Entertainment Group, supra,* 854 F.2d at 1473 n. 9, other circuit courts have.

In *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 801 F.2d 1531 (9th Cir. 1986), the Ninth Circuit observed:

Rule 11 does not apply to the mere making of a frivolous argument. The Rule permits the imposition of sanctions only when the 'pleading, motion, or other paper' itself is frivolous, not when one of the arguments in support of a pleading or motion is frivolous. Nothing in the language of the Rule or Advisory Committee Notes supports the view that the Rule empowers the district court to impose sanctions on lawyers simply because a particular argument or ground for relief contained in a non-frivolous motion is found to be unjustified. In short, the fact that the court concludes that one argument or sub-argument in support of an otherwise valid motion, pleading, or other papers is unmeritorious does not warrant a finding that the motion or pleading is frivolous or that the rule has been violated.

*Id.* at 1540–41. Similar observations have been made in other circuits. *Burull v. First Nat. Bank of Minneapolis,* 831 F.2d 788, 789 (8th Cir.1987), *cert. denied sub nom. Arthur Young & Co. v. Burull,* — U.S. —, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988); *Brown v. Federation of State Medical Bds.,* 830 F.2d 1429, 1434 n. 2 (7th Cir.1987). The Third Circuit has held that the inclusion of a dubious count in a complaint along with a number of counts of reasonable merit did not so burden the litigation process to trigger Rule 11. *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90, 97 (3d Cir.1988). The Court noted, however, that "the practice of 'throwing in the kitchen sink' at times may be so abusive as to merit Rule 11 condemnation." *Id.*

This same sensible principle was articulated by the *Burull* court when it concluded that "[w]hether meritless elements of a complaint combine to render the pleading frivolous as a whole is a 'matter for the Court to determine, and this determination involves matters of judgment and degree.'" *Burull v. First Nat. Bank of Minneapolis,* 831 F.2d at 789, citing *O'Connell v. Champion International Corp.,* 812 F.2d 393, 395 (8th Cir.1987).

From these and other decisions several critical principles emerge which will undoubtedly continue to influence developing Rule 11 jurisprudence. First, there is the recognition that even the most compelling legal position might on occasion be heralded by frivolous argument. Second, a companion principle as well as experience teach us that even the most responsible advocate will at times be encumbered by excessive zeal and may advance to a position beyond which reason and sound judgment would have lead. Sensitive to this, commentators, the practicing bar, and most judges agree that Rule 11 must be deployed with restraint so as not to stifle creativity or otherwise dampen imaginative, inspired advocacy. A balance must be struck.

With all this in mind, the Court concludes that plaintiff's counsel's attack on the jury selection procedures is so devoid of legal or factual support that it warrants the imposition of Rule 11 sanctions. His challenge was not intended as a subsidiary argument in support of an otherwise valid legal position. The position advanced was bogus from the start, reflecting an intolerably cavalier, "kitchen sink" attitude that belies counsel's responsibilities to the Court.

Sanctions are no less warranted because the impact of plaintiff's jury challenge on the overall litigation was relatively modest. And certainly, logic would be offended if counsel's packaging of his jury challenge in an otherwise viable post-trial motion would insulate him from appropriate reprimand. While the cited cases clearly preach flexibility and forebearance when an attorney's argument strays wide of the mark, they cannot be read to excuse baseless litigation wrapped conveniently with the ribbon of responsible argument.

## 2. The Misrepresentation Regarding the Battistelli Testimony

█ Shortly before the commencement of the trial, plaintiff's counsel made an application to amend the pre-trial order to add a witness, James Battistelli. When Crown objected to this late addition, the Court entertained argument to determine whether the reasons proffered by plaintiff's counsel justified the naming of Mr. Battistelli as a witness at the eleventh hour.

Joseph Napoli, trial counsel for the Eisen firm, explained as follows regarding the issue of the late addition of Mr. Battistelli:

> On Thursday to Friday, there was delivered to me, since I am getting involved with this case, is the transcript of the case involving a Mr. Battistelli. This is a case that was pending in Supreme New York in the Southern District of New York. Mr. Battistelli had an accident with the same equipment, handling the same way. His foot got caught between a pillar and the machinery. So he is the witness. Now, they knew about him. They deposed him in his own personal injury case as to the problems with this injury case as to the problems with this thing backing up in the past. Right.

Transcript, at 78. The clear import of Mr. Napoli's representation—as understood by the Court and by defendant's counsel—was that Mr. Battistelli should be permitted to testify because plaintiff's counsel had just learned of Mr. Battistelli's case and thus the situation presented was *not* one where counsel had known about the witness for some time and had omitted his name from the pre-trial order. As the Court later learned, however, plaintiff's counsel *had* known about Mr. Battistelli's action for over a year.

This fact was revealed during the cross-examination of one of plaintiff's experts, Arthur P. Weber, who was asked by Crown's counsel to produce all of the documents sent to him by the Eisen firm in connection with this action. One of those documents, which was marked defendant's exhibit FF, was a letter from a Mr. Yankowitz of the Eisen firm to Mr. Weber stating that the Eisen firm had had in its possession in 1985 "pleadings and documents from a companion case, *James Battistelli v. Crown Lift Trucks*, including plaintiff's answer to interrogatories, defendant's answers to interrogatories, defendant's document production, answer to summons and complaint and deposition of defendant, Crown Lift, on March 28, 1985."

After the revelation of these facts, Crown renewed its objection to the addition of Mr. Battistelli as a witness, arguing that Mr. Napoli's statement that plaintiff's counsel did not know about Mr. Battistelli's case until the eve of trial was starkly belied by the Yankowitz letter. Missing or ignoring the point, Mr. Napoli argued that there was no surprise involved because Crown had deposed Mr. Battistelli in the prior action. Mr. Napoli did not explain or clarify when he or his firm learned of Mr. Battistelli. Transcript, at 340, 342.

The Court then questioned defendant's counsel about the possible prejudice that Mr. Battistelli's testimony would cause, notwithstanding the apparent misrepresentation by plaintiff's counsel. Counsel for Crown stated:

> I am not prepared for him. I have not had the opportunity to prepare for him that I should have had and this suggestion which Mr. Napoli continues to make in light of his firm's letter that he just found out about it is wrong. It is wrong, and I remind your honor, if I may respectfully, of the obligations imposed upon counsel pursuant to Rule 11, and it is time, I must respectfully suggest, that those obligations are enforced.

Transcript, at 343-44.

The Court, thus faced with the spectre of either prejudicing the plaintiff by excluding relevant testimony because of actions taken by his counsel or exposing the defendant to the possibility of prejudice by the admission of testimony of an eleventh hour witness, allowed Mr. Battistelli to testify. The Court observed, however:

> I find this very disturbing. Certainly, no matter what. We will take this up when the case concludes. That I assure you of. I say this for the record, I'm referring to Defendant's FF.
>
> \*　\*　\*　\*　\*　\*
>
> There has got to be a way to police this and I am on a collision course between what certain findings tell me in terms of the merits of this matter as opposed to insuring that the Court's processes are

respected and that counsel's behavior in the courses are irreconcilable.

Transcript, at 344-45.

Crown argues strenuously that sanctions should be imposed for plaintiff's counsel's intentional misrepresentation. This Court agrees. Sanctions may be imposed under section 1927 and pursuant to the Court's inherent power over members of its bar, an authority expressly recognized by the Supreme Court in *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). There, the Court noted that "[t]he power of a court over members of its bar is at least as great as its authority over litigants. If a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes." *Id.* at 766, 100 S.Ct. at 2464. *See Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973) (" '[B]ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation").

In *Oliveri v. Thompson, supra,* our Court of Appeals pointed out that this Circuit has interpreted the "bad faith" standard restrictively. Thus, a bad faith sanction will not be upheld absent "both ' "clear evidence" that the challenged actions "are entirely without color, and [are taken] for reasons of harrassment or delay or for other improper purposes" ' and 'a high degree of specificity in the factual findings of [the] lower courts.' " 803 F.2d at 1272 (quoting *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir.1986) (citations omitted)).

It is clear to this Court that Mr. Napoli intentionally misrepresented the facts surrounding Mr. Battistelli. By any definition, that constitutes bad faith. Plaintiff's counsel does not deny the charge. Furthermore, plaintiff's counsel does not argue that what Mr. Napoli really meant was that he had just received the *Battistelli* documents from his partner and not from opposing counsel or any other source. Instead, he argues that since Mr. Napoli conducted only the trial and not the pre-trial aspects of the case, he should not be

charged with knowing that the Eisen firm had had the Battistelli documents for over a year.[6] This argument is utterly irresponsible and unpersuasive. Counsel simply cannot make representations regarding the receipt of pre-trial materials and then, when those representations prove to be untrue, seek relief by claiming that he is only trial counsel. If Mr. Napoli intended to convey that he had just started reviewing his firm's files and had discovered that other lawyers in his firm had omitted a witness, he should have made that clear to the Court. He purposefully chose another course. Rather than claiming inadvertance and arguing that the defense would not be prejudiced by Mr. Battistelli's appearance as a witness, counsel comfortably chose the course of dissembling and misdirection.

This Court finds that, in so doing, Mr. Napoli intentionally misrepresented the facts to the Court and thus has, in the words of Judge Pratt, failed to give proper regard to his "obligations of truth, candor, accuracy, and professional judgment." *Oliveri v. Thompson, supra*, 803 F.2d at 1267.

### 3. Plaintiff's Improper Summation

■ As noted above, one of plaintiff's theories at trial was that Crown's lift truck was defective because it was not equipped with a door on the operating compartment. In aid of establishing that theory, plaintiff identified shortly before trial Exhibit 13, which was described as follows: "Blue Print of Retrofitted door for Crown Lift Truck 35RCTT." Plaintiff intended to use that exhibit to show that a door had been put on some of defendant's lift trucks but not others.

During the trial, Crown's expert, Dr. Dunlap, testified on October 26, 1987, that Crown did not offer a door for the lift truck that was the subject of the lawsuit. However, he testified on the next day that, while doors were not offered to customers as standard equipment or options, Crown would provide a door if a customer specifically demanded one. During summation, plaintiff's counsel tried to make much of Mr. Dunlap's qualification of his earlier testimony:

On, well, and I go back to the word malicious because if you remember the first day that Mr. Dunlap testified, he was as basically, well, you people supply doors in this kind of—did you for this machine, and he said no. You can have his testimony read back. Counsel asked him what happened between the day he was asked that question and the following day? You saw what I had. I got the prints and I asked him about the case in Philadelphia. I got the blueprints where Mr. Utricht testified. You will see that they are right on here. Mr. Utricht testified and we will talk about Mr. Utricht. He is their vice president of engineering, who didn't show up. He is the guy who testified here, he testified on September 22, 1987. Utricht. Exhibit 6. This was it. All right. You can see it here. This is the door they finally produced the door not to us, but to another lawyer in Philadelphia on September 22, 1987. Take a look at it. Up here. Take a look at it. He wouldn't admit to the fact that they were supplying doors to this machine on the first day he testified. It is only when I get these things coming up and they know I have it and they know I have the transcript, that shows, that shows that his boss, Utricht, testified that they did supply a retrofit door for this machine.

Remember how they took great pains of telling you that we didn't have a door because the industrial regulations say that egress, going in and out, in and out, that means you shouldn't have a door. That all of a sudden if a customer wants a door, they are in there for the buck. Give them a door. That is how concerned they are about safety. Wait a minute. Pinch points. We only give doors if there's a projec-

---

**6.** Mr. Napoli did not appear at the oral argument of the motions. This argument was raised by co-counsel, Richard Leotta.

ting object. Well, what about K–Mart. Isn't that a projecting object? What about, I show you this document now. What about other people? Yeah, there are other people. Well, yeah, it is only one percent.

7. The colloquy that took place following Crown's objection is as follows:

THE COURT: These are troubled waters, obviously. I am aware of that. Let me make sure I understand precisely what your point is. Let me hear it from you.

MR. BAINTON: Your Honor, I apologize, my blood pressure has gone down.

Mr. Napoli's statement that Mr. Dunlap changed his testimony because he learned that he, Mr. Napoli, had blueprints of the door that had been installed on a lift truck of the type involved in this lawsuit, is false.

THE COURT: So it constitutes a matter, a statement not in evidence.

MR. BAINTON: That too, sir, but some of it is worse than others. I think the only way to cure this is for you to tell the jury in no uncertain terms what Mr. Napoli said is false and they should disregard it. Coming from me it is only argument. Coming from you, if you instruct them that it is false, as it is in fact is false, and that they are to disregard it, that is going to go some distance towards during the problem.... I think my client has been prejudiced in perhaps the most outrageous way yet.

THE COURT: I am not going to tell the jury it's false, because I have to be concerned how that, why shouldn't I tell the jury to disregard that comment.

MR. NAPOLI: Your Honor, what—

THE COURT: First of all, I don't recollect a change in the testimony.

MR. NAPOLI: Judge—

MR. BAINTON: It wasn't, sir.

MR. NAPOLI: Judge, it is not false and it is not to be disregarded. What I said is a fair comment. The man came in.

THE COURT: You said he changed his testimony.

MR. NAPOLI: He came in and testified on direct examination that they did not have available a door for this particular machine. That was his direct question. Then it was, the next day that he came in and testified on direct examination of him again, that they made the door available for a limited purpose when they had the pinch points.

THE COURT: When he testified the first day, you will concede that Mr. Dunlap as well as the entire defense team was well aware that this retrofit door was available.

MR. NAPOLI: He didn't testify to that. He testified to the opposite. He is asking you to sum up for him. I am telling you the report and I would have ordered the daily transcript, the record is that he testified that there was no such door available. Then he comes in the next day, he comes in the next day and says that it is available for a limited purpose. My comment—

Transcript, at 889–90.

Following plaintiff's summation, Crown objected to the references made to the blueprints and their relation to Mr. Dunlap's testimony.[7] Specifically, Crown point-

THE COURT: I am going to do, I am going to review with the reporter, informally the testimony of Mr. Dunlap. If I don't find that comment, I will certainly correct it to the jury in no uncertain terms, because I think, I don't recall it, but these are very dangerous waters for me to tread in the middle of summation. I will not hesitate if in reviewing it informally with Mr. Lorber I confirm that's what he testified. I do recall specifically the discussion in chambers when we were negotiating a pretrial order, the fact that included the pretrial order, for exhibits, the door, that you displayed to the jury during your final remark for the door itself, so but for—if your point is that notwithstanding the availability of the information that there was a mistake or an error or false testimony, if that is reflected in the minutes, so be it. I must say I would be very surprised and if I don't find it, I will take the steps along the lines Mr. Bainton suggests.

MR. NAPOLI: May I finish? May I finish? Not only did he then come in and testify the next day that there was, there was now all of a sudden available, but it was only available for a limited purpose. It was available for a limited purpose only when these things would stick out.

THE COURT: No, that was not his testimony. I remember it very clearly because I listened very clearly. There was, now, you are entitled to your interpretation. You can argue that all you want. You are attempting through the K–Mart analogy to get him to say that it was only available when things stuck out. Mr. Dunlap said a number of occasions so as not to be put in that corner, I don't know what the K–Mart operations are. I have never been in their warehouse facility.

He gave as an instance as one fact that in some facilities there are long objects sticking out and one of the purposes of the door for a possible user might be to protect the occupant under those circumstances.

We are not going to get into that. You can argue that and Mr. Bainton can argue that. What I am talking about is something far more fundamental. You argued for the jury, he changed his testimony when he found that you're in possession of certain information. A, the reference to your being in possession of certain information is not a matter of evidence in this case.

Number one, I recall no change in his testimony whatsoever. Now, I am proceeding very cautiously because I don't want to take any steps that could impact unfairly on Mr. Veliz.

I am going to review informally with Mr. Lorber those minutes of his testimony on the first day. If I find it, fine. If I don't find it, I will take what I think is responsible and appropriate action.

ed out that the blueprints to which Mr. Napoli referred were the very blueprints that had been listed in the pretrial order and which had not been received in evidence. Thus, Crown argued, the suggestion that Mr. Dunlap changed his testimony because he realized that plaintiff's counsel had obtained documents between his first and second day of testimony was false because plaintiff's counsel had had the documents prior to trial. Moreover, counsel had referred in his summation to matters not in evidence.

Counsel's reference to the blueprints and their relation to Mr. Dunlap's testimony

> MR. NAPOLI: Can I draw your attention, when you do review the minutes, the first day he testified on direct examination in answer to the question, then the second day he then again testified to direct examination to his question, and the answer was that it was only to projecting objects that they would recommend—
> THE COURT: I will look at it.
> MR. NAPOLI: Then it was on cross-examination by me. It was on cross-examination by me where he then admitted it was,—it was K–Mart and he admitted it was others and if I can just relate what occurred. When we got these drawings of this door and we didn't get it from them, we did not get the drawings from them. We got the drawings from the firm in Philadelphia.
> I was reluctant to use the drawings even though we had marked them as an exhibit because I could not tell if it was a door that would fit over that particular opening.
> So I on Saturday called the attorney in Philadelphia. He told me that the transcript had not been—on Friday had not been transcribed, and that he would get it done on Monday.
> He got it done on Monday. I sent a messenger down there Monday night and went down and picked them up and gave them and he brought them in on Monday morning. Excuse me, I think it was Tuesday morning. It was after, after I had gotten that transcript that he had gotten back on the stand on direct again, and he testified as to what I said he testified to and it was only on cross-examination that he admits that it wasn't only for projectiles, but it was for K–Mart and other situations, showing him that transcript, and the point I was making was that he did not want to admit to the door, and even on redirect he tried to limit his testimony to the fact that it was only one-tenth of one percent and I was able to bring out that they never told anyone about it, like they haven't told us about it.
> THE COURT: No. No. That's not what you brought out. He brought out he never told anybody about it. As he pointed out, that's what you brought out. I will bring the jury in.
> MR. BAINTON: Your Honor, the one thing as to—I think this is very important—I don't know

was clearly improper. The blueprints were not in evidence and, more importantly, the statement to the jury that Mr. Dunlap changed his testimony because plaintiff's counsel had gotten hold of the blueprints between the first and second day of testimony was, in a word, false.

Although antics of this sort are clearly inexcusable, if this episode had been an isolated transgression, it might best be characterized as a momentary lapse, the product of unchecked zeal in a hotly contested, and at times, acrimonious litigation. Unfortunately, the pattern of counsel's

> if I am taking too much time, I apologize. I view this as terribly important.
> The one thing as to which there can be no doubt, those drawings were listed at least the Friday before this trial on the pretrial exhibit and we knew about them and he said we didn't.
> Your Honor, I think before, it is almost four-thirty. Before I am asked to sum up to the jury, in all fairness to my client who I think has been abused time and time again by the misconduct of the plaintiff's attorney during the course of this trial, this issue ought to be resolved before you ask me to sum up to the jury.
> THE COURT: I am going to decline to do it. I don't contest it for one moment. Based on the order, the subject of discussion, one could get technical. I don't know if Mr. Dunlap was technical or not. What concerns me, I am not going to assert myself in the adversarial process. I am not going to be the referee on the differences of interpretation.
> What concerns me, fundamentally, there has been a claim by reference to information not in evidence that a witness changed his testimony, and if that is patently unsupported by the record, I will take appropriate steps to this jury. Beyond that, I am going to leave it to counsel, and I concede it, and this is a matter which I assure you, it will be given my attention when this case is over with. Conceded that it may in fact render a disservice in some way unfair to your client.
> MR. BAINTON: May I ask one more question? May I be permitted to refer to the pretrial order in my summation and refer to the fact that those documents were identified and produced by the plaintiff before this trial started? May I? I am asking now so I don't get myself in hot water which I think Mr. Napoli either is in or belongs.
> THE COURT: It seems to me, to go back to Mr. Napoli's favorite saying, sauce for the goose. He referred to information outside the record. In that instance I will permit you to make that reference.
> Transcript, at 911–918.

conduct does not permit such a charitable characterization.

In addition to those instances discussed above, Crown reminds the Court of other episodes warranting close scrutiny such as the repeated failure of plaintiff's counsel to comply with the Court's pretrial order; counsel's urging the Court to respond to a jury inquiry with a patently incorrect legal instruction; and the existence of material variances between the anticipated testimony of certain plaintiff witnesses as outlined in the pretrial order and their testimony at trial. One such witness, Andrew Prescia, tendered testimony at trial far more favorable to plaintiff than he had given during his deposition. Crown argues, with logic and inference on its side, that plaintiff's counsel knew of the change in testimony and intentionally did not disclose it in his pretrial order or, at least, prior to Mr. Prescia's appearance at trial. To be sure, this witness's appearance was not the high point of the trial. Even the most sympathetic listener would have had some difficulty in crediting his entire testimony.

Without doubt the record of this case is no handbook or primer on effective, responsible advocacy. Rather it is replete with instances when plaintiff's counsel resorted to tactics more suitable to a street fight than a court of law. At times counsel sought some obvious tactical advantage, all too often exhibiting an "anything goes" attitude and demonstrating rank indifference or apparent obliviousness to applicable rules and professional responsibilities.

This Court must act. The difficult task of insuring fundamental fairness as a presiding judicial officer and maintaining the dignity of court proceedings must be reconciled with the regrettable need to police some attorneys' behavior. It is an unpleasant endeavor with valuable time forever lost watching lawyer pitted against lawyer in satellite litigation over sanctions, far removed from the merits of the underlying controversy. And, ever present is the abiding sense that the profession is not well served by these painful exercises that tax a demonstrably undernourished judicial system and divert energies and attention away from more deserving litigation.

In imposing substantial monetary sanctions in this case, the Court is starkly aware that such sanctions alone are not the answer. Our limited experience already suggests that judicially imposed sanctions do not necessarily deliver the intended deterrent effects and rarely does any monetary sanction totally compensate the injured litigant or the system for the staggering costs incurred. Until the legal community deals more effectively with the problems of unbounded advocacy, it may well be said that the excesses of one misguided advocate are indeed the excesses of all. And, while we may, as here, be able to afford a measure of relief to those individual victims of attorney misconduct, the damage to the profession will not be so easily remedied.

With these thoughts in mind, the Court turns to the business of fixing the appropriate amount of monetary sanctions. In doing so, the Court acknowledges, as defendant's counsel concedes, that quantifying the additional expenses incurred by Crown as a result of the offending conduct is a difficult endeavor despite the convincing case for sanctions presented in the record and the inevitability that unnecessary costs were indeed incurred. The Court also harbors the hope, perhaps unrealistically, that the criticisms of counsel reflected in the preceding pages will be perceived by counsel as a serious condemnation of their behavior and will deter them from resorting to similar tactics in the future. Nevertheless, a monetary sanction is needed to underscore the gravity of the matter and to compensate an abused litigant in a meaningful way.

The Court directs that the law firm of Morris J. Eisen, P.C. and Joseph Napoli, jointly and severally, pay to Crown Lift Trucks (1) reasonable attorneys' fees incurred in connection with the preparation of Crown's application for sanctions, (2) statutory costs of the action, including the cost of transcribing the trial transcript, and (3) the sum of $7,500 for attorneys' fees incurred as a result of the conduct previ-

ously described. Crown's counsel shall submit to the Court its claim for fees relating to this motion within thirty days at which time the Court will direct entry of a Supplemental Judgment in accordance herewith.

CONCLUSION

Plaintiff's motion for a new trial is denied. Defendant's motion for sanctions is granted.

SO ORDERED.